Robert T. DEVERAUX, et al.,
Plaintiffs,

v.

William J. GEARY, et al., Defendants.

Civ. A. No. 84–2181–MA.

United States District Court,
D. Massachusetts.

Nov. 7, 1984.

Gabriel O. Dumont, Jr., Grady, Dumont & Dwyer, Boston, Mass., for plaintiffs.

Despena F. Billings, Asst. Atty. Gen., Boston, Mass., for defendants.

James H. Wexler, Herrick & Smith, Boston, Mass., for intervenors.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The issue in this procedurally complicated case is straightforward: does a recent Supreme Court decision so change Title VII law as to require modification of a five year old consent decree in a racial discrimination case? The plaintiffs in this case argue that the decision, *Firefighters Local Union No. 1784 v. Stotts*, —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) brings into question the validity of the consent decree in this and other affirmative action cases.

### I.

The plaintiffs in this case are five white police officers employed by the Metropolitan District Commission (MDC), an agency of the Commonwealth of Massachusetts. On April 23, 1983, they took a competitive examination to determine their eligibility for promotion to captain. In early June, 1984, one temporary captain position became available. On July 6, 1984, Donald E. Callender (Callender), a black police officer, was awarded the position, although his score on the examination was lower than those of the plaintiffs. Callender was awarded the job as a result of the MDC's efforts to comply with the "minority employment objectives" established by a consent decree entered by this Court on August 27, 1979 in *Culbreath v. Dukakis* (D.Mass., No. 74–2463–MA). That consent decree entered in response to a class action brought by plaintiffs who alleged significant under-representation of minorities in several Massachusetts agencies, including the MDC. The decree included a stipulation that it was designed to remedy the widespread discriminatory employment practices alleged in the complaint.

The mechanics of the decree were as follows. Each affected state agency was to establish two separate civil service eligibility lists for each job title covered by the decree. The first list would be the usual list required by state law. The second would be a special minority eligibility list, from which the agency was to select applicants until the "annual minority hiring objective" for the job category and department was met.

In the present case, the MDC had failed to meet its annual minority hiring objective for the position of Provisional MDC Police Captain as of the date the position became available in June, 1984. The MDC apparently selected Callender from the special minority eligibility list in an effort to comply with the requirements of the consent decree.

The plaintiffs filed suit against William J. Geary, Commissioner of the MDC, and Thomas E. Keogh, Superintendent of the MDC (collectively, the defendants) on July 16, 1984. They claim that the defendants have violated their civil rights, specifically their right of equal protection as guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1981. But for their race, they claim, one of them would have been awarded the position given to Callender.

On August 8, 1984, the defendants filed a motion to dismiss pursuant to Fed.R. Civ.P. 12(b)(1) and 12(b)(6), claiming the following. First, this Court lacks jurisdiction because the Eleventh Amendment bars a federal court from ordering state officials to conform their actions to state law. The substance of the claim, they argue, is that the MDC officials did not comply with the state civil service hiring and promotion guidelines.[1] Second, the plaintiffs have failed to state a claim upon which relief can be granted because (a) they lack standing; (b) the claims are barred by the doctrine of

---

1. In light of the disposition of this case made below, I do not reach the defendants' argument that this Court lacks jurisdiction due to the Eleventh Amendment.

*res judicata;* and (c) the state defendants were complying with the *Culbreath* consent decree.

On August 16, 1984, representatives on behalf of the plaintiff class in *Culbreath* (the Class) moved to intervene pursuant to Fed.R.Civ.P. 24(a). The Class claims that it has a substantial interest relating to the subject of the litigation in that the ultimate relief sought by the plaintiffs would have the effect of vacating *Culbreath* and would therefore have a substantially adverse impact on the interests of the Class. It also claims that the present defendants cannot adequately represent the interests of the Class in this case. The Class filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), claiming that (a) the defendants' action was consistent with the consent decree and (b) the plaintiffs' claims are barred by the doctrine of *res judicata.*

On August 30, 1984, the plaintiffs filed their opposition to the defendants' motion to dismiss. To date, the plaintiffs have not opposed the motion of the Class to intervene in this case. The case is therefore before this Court on the defendants' motion to dismiss and the unopposed motion of the Class to intervene in this case.

## II.

■ Although filed as a separate suit, it is apparent that this suit is in essence an attack on the *Culbreath* consent decree. The plaintiffs themselves have stated:

> Assuming that the instant proceeding is more properly viewed as an effort to intervene in the *Culbreath* case, such intervention should be permitted. In this regard ... *Stotts* represents a significant and substantial shift in Title VII law.

Plaintiffs' brief at 10. Both the defendants and the Class have filed memoranda arguing that this suit constitutes an attempt to intervene in the *Culbreath* case. Defendants' brief at 9; Class' brief at 3. Since the present action directly attacks this Court's order in *Culbreath* and seeks to interfere with the goals established by the consent decree, I find that it constitutes an attempt

to intervene in that case. As such, this Court's decision is guided by the First Circuit opinion affirming this Court's refusal to permit a prior intervention in the *Culbreath* case. *Culbreath v. Dukakis,* 630 F.2d 15 (1980).

In that opinion, the court adopted the test set forth in *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977). *Stallworth* sets forth four factors to be considered in determining the propriety of permitting intervention: (1) the length of time the intervenor knew or reasonably should have known of his interest before he petitioned to intervene; (2) prejudice to existing parties due to the plaintiffs' failure to petition for intervention promptly; (3) the prejudice the plaintiffs would suffer if they are not allowed to intervene; and (4) the existence of unusual circumstances militating either for or against intervention. I treat these factors *seriatim.*

1.  *Length of time the intervenor knew or reasonably should have known of this interest before he petitioned to intervene.*

The facts presently before this Court are virtually identical to those before the Circuit Court in 1980, with the exception of the existence of the *Stotts* opinion. It is clear that if it was unreasonable for the labor unions in that case to intervene more than four years after the complaint was filed, it is even more unreasonable to permit the plaintiffs to intervene now, more than ten years after the complaint was filed. In their brief, the plaintiffs make the puzzling statement that they "were not potential intervenors" in *Culbreath.* Plaintiffs' brief at 10. The basis of this statement is not altogether clear to me. The brief states that the Massachusetts Law Enforcement Council (MLEC), one of the unions barred from intervening in 1980, was no longer the official statewide law enforcement bargaining unit as of November 22, 1977. Even if MLEC did not represent police officers as of the date its petition to intervene was denied, the goals and mechanisms sought by the complaint in

*Culbreath* were well publicized. *Culbreath*, 630 F.2d at 21. It is inconceivable that the plaintiffs did not previously know of the consent decree and its impact on their rights given that it has been five years since the decree was approved and implemented. The plaintiffs' brief offers no indication of why these police officers were not aware of and should not be bound by the *Culbreath* decree. Like the Circuit Court, I "see no excuse for the failure [of the plaintiffs] to learn of a suit and reported decisions so related to [their] promotion prospects...." *Id.*

2. *Prejudice to existing parties due to the plaintiffs' failure to petition for intervention promptly.*

If the plaintiffs in this case are successful, the effect will be to disallow implementation of the consent decree. Nothing could more clearly prejudice the interests of the existing parties. The plaintiffs' success would constitute an extreme example of "last minute disruption of painstaking work by the parties and the court." *Id.* at 22 (citations omitted).

3. *The prejudice the plaintiffs would suffer if they are not allowed to intervene.*

Because the present plaintiffs' claims of prejudice are identical to those raised by the unions in the First Circuit's *Culbreath* decision, the discussion of this issue in that case is particularly helpful:

The unions' second claim of prejudice, that the minority employment and promotion mechanisms of the consent decree violate the fourteenth amendment and sections 703(h) and (j) of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(h) and (j), has caused us more concern. While this is not an unusual argument in a race discrimination case, the tenuous posture of the unions gives it added importance. *If we affirm the district court's denial of intervention for untimeliness, the unions and their members may be forever foreclosed from challenging the goal mechanisms of the decree. Collateral attack on the decree will be impossible because only the district court supervising implementation of the decree will have subject matter jurisdiction to modify the decree. Intervention to modify the decree, the proper procedural recourse under the circumstances, will be barred by the doctrine of res judicata.*

The essence of the timeliness determination, however, is whether the unions received such notice and opportunity to be heard as to satisfy the due process rights to be accorded persons so situated. The record shows that the district court entered the consent decree on August 27, 1979. We must assume that it determined that the settlement secured by the consent decree was fair, adequate and reasonable. *In reviewing the decree, the district court was undoubtedly aware that racial preference schemes are an accepted means of remedying past discrimination in our society. The only serious question before the district court would have been whether the stipulation of facts constituted a finding of past discrimination sufficient to justify the use of racial preferences at the expense of innocent persons.* Although the entry of the consent decree does not constitute a finding of facts or a ruling of law, it is a determination of probability of success on the merits. Moreover, we note that none of the intervenors appear to have disputed the statistical evidence of racial discrimination in the employment and promotion practices of the defendant agencies. The stipulation of facts would have been a powerful and conclusive admission of the facts contained therein under Fed.R.Civ.P. 36(b). *Viewing these facts from a position considerably enhanced by our extensive exposure to the Massachusetts civil service system, we have no difficulty in upholding the district court's conclusion that plaintiffs enjoyed a substantial probability of success on the merits. We consider the prejudice flowing to the unions from denial of intervention to be as slight as the unions' prob-*

*ability of success on the merits of the issues they would raise upon intervention.*

*Id.* at 22–23, citations and footnotes omitted. Absent some unusual circumstance, this holding in *Culbreath* must govern this case. I too find the prejudice to the plaintiffs flowing from denial of intervention to be as slight as their likelihood of success on the merits.

4. *The existence of some unusual circumstances militating either for or against intervention.*

This fourth and final consideration is at the heart of this case. The plaintiffs' argument is that the change in Title VII law made by *Stotts* is an unusual circumstance that requires this Court to reconsider the validity of the consent decree. *See* Plaintiff's brief at 10. The basis of the present claim is as follows:

As relates to the instant case, there can be no dispute that the *Culbreath* consent decree establishes racial quotas relative to the appointment of individuals to positions covered by the decree. In addition, the Stipulation of Facts in *Culbreath* indicates that the judicial authority for these quotas is founded on Title VII. Since ... such quotas are no longer permissable [sic] under Title VII and since the Supreme Court has stated that the terms of a consent decree should be modified to reflect changes in applicable law, the *Culbreath* consent decree must be modified so as to eliminate the racial quotas and correspondingly any bar to the instant action.

Plaintiffs' brief at 9. This Court is therefore called upon to try to determine the scope of the holding in *Stotts.* I note that, to date, few other courts have faced this question.

The facts of *Stotts* are simple and familiar. The complaint in that case stated that officials of the City of Memphis were engaged in a pattern or practice of making hiring and promotion decisions on the basis of race in violation of Title VII of the Civil Rights Act and 42 U.S.C. §§ 1981 and 1983. The district court certified a class action

and eventually approved a consent decree on April 25, 1980.

The decree adopted a long-term goal of increasing the proportion of minority representation in numerous job classifications. The City explicitly stated that it did not, by signing the decree, admit the allegations of the complaint concerning any violations of law. Neither the decree nor a prior, 1974 City-wide decree mentioned what was to happen in the event of any layoffs or reductions in rank. Neither decree awarded any competitive seniority.

In 1981, projected budget deficits required the City to announce layoffs of non-essential personnel. These layoffs were to be made on the "last hired, first hired" rule applicable generally to all City employees. A black firefighter thereupon sought and received from the district court a temporary restraining order forbidding the layoff of any black employee. Shortly thereafter, the district court entered an injunction, noting that the decree did not contemplate the method to be used for reductions in rank or layoffs. The court explicitly found that the layoff policy was not adopted with any intent to discriminate, but that nonetheless it would have a racially discriminatory effect. The court ordered the City not to apply the seniority policy so as to decrease the percentage of black employees in several categories. Layoffs occurred in compliance with the injunction, and in some instances resulted in the layoff of non-minority employees with more seniority than minority employees.

The Court of Appeals for the Sixth Circuit affirmed, despite its conclusion that the district court was wrong in holding that the city's seniority system was not bona fide. On June 12, 1984, the Supreme Court reversed the judgment of the Court of Appeals.

The Supreme Court's discussion in *Stotts* is divided into two parts. Part A discusses the Circuit Court's finding that the injunction did no more than enforce the agreed-upon terms of the decree. The Court noted that the decree itself did not mention lay-

offs or demotions and there was no suggestion of any intention to depart from the existing system. In contrast, in the present case the express terms of the decree contemplate hiring conducted in exactly the way that occurred and for exactly the same reasons.

In the same part of the opinion, the *Stotts* Court at least implied that it still considered the affirmative action program instituted by the decree to be a permissible remedy under Title VII:

> The decree went on to provide the agreed-upon remedy, but as we have indicated, that remedy did not include the displacement of white employees with seniority over blacks. Furthermore, it is reasonable to believe that the "remedy", which it was the purpose of the decree to provide, would not exceed the bounds of the remedies that are appropriate under Title VII, at least absent some express provision to that effect.

*Id.*, —— U.S. ——, 104 S.Ct. at 2586. Had the Court meant to rewrite Title VII law to mean that all affirmative action programs are improper absent a finding of actual past discrimination, it would have said so here. *See Culbreath*, 630 F.2d at 23, *citing United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United States v. City of Miami*, 614 F.2d 1322 (5th Cir.1980); *Boston Chapter NAACP, Inc. v. Beecher*, 504 F.2d 1017 (1st Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Associated General Contractors of Massachusetts, Inc. v. Altshuler*, 490 F.2d 9 (1st Cir.1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). The clear implication of the above language is that the actual remedy that was provided by the decree was valid and did not exceed the bounds of Title VII, although the subsequent displacement of white employees was invalid.

Part B of the Court's opinion discussed the authority of the district court to modify the consent decree in light of unexpected layoffs. The Court found that the City's seniority system was a bona fide plan that did not have as its purpose an intent to discriminate on the basis of race. The Court then went on to discuss a district court's authority to contravene the provisions of such a bona fide plan in order to enforce Title VII rights. The Court reiterated its ruling in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) that a district court may award *competitive seniority* only when the beneficiary of the award has actually been a victim of illegal discrimination. The Court went on to support the holding in that case by referring to the legislative history of Title VII. It quoted or cited the remarks of Senators Humphrey, Ervin, Hill, Robertson, Smathers, Stennis, Tower, Clark, and Case. *Id.*, —— U.S. ——, 104 S.Ct. at 2589-90. At least some of those remarks, as the plaintiffs in this case have pointed out, are extremely broad reaching. Read literally, they could be interpreted to require a finding of actual discrimination prior to entry of *any* affirmative action plan. The context of the Court's discussion, however, is a consideration of a competitive seniority award. The Court did not question the validity of the underlying decree. Had the Court intended to radically change its interpretation of Title VII law so as to require a finding of actual discrimination in *any* affirmative action case, I believe it would have said so. In the absence of clearer authority, I decline to read such an expansive meaning into an opinion limited to a discussion of layoffs made in violation of a bona fide seniority system. The plaintiffs here seek too broad a rule from too narrow a set of facts.

■ In short, neither Part A nor Part B of the *Stotts* opinion supports the plaintiffs' claim in this case that Title VII law has so substantially changed as to invalidate the *Culbreath* consent decree. *Stotts* is simply inapplicable to this case.[2] It

---

**2.** I note that the Third Circuit recently discussed the continuing legality of an affirmative action

program controlling the hiring of teachers in the Philadelphia public school system. *Krom-*

therefore cannot form the kind of unusual circumstance that would militate in favor of granting a motion to intervene. As a result, I find that the plaintiffs' attempt to intervene in the *Culbreath* case by means of this complaint is untimely and must be denied. *See Culbreath,* 630 F.2d at 24. The defendants' motion to dismiss for failure to state a claim is therefore granted.

█ Although the motion of the Class to intervene in this case might be considered moot in light of the above ruling, I consider the motion because the Class may wish to participate in any appellate review of this order. I find that the Class has a significant interest in the outcome of this action and that resolution of the case in favor of the plaintiffs would have a substantially adverse impact on the interests of the Class. I further find that the present state defendants cannot adequately represent the interests of the Class in this case. The motion to intervene is therefore allowed.

## CONCLUSION

For the reasons stated above, the motion of the defendants to dismiss the case for failure to state a claim is allowed. The motion of the Class to intervene is allowed.

SO ORDERED.

---

nick v. School District of Philadelphia, 739 F.2d 894 (3d Cir.1984). The opinion in that case implies that the court believed the holding in *Stotts* to be limited to situations involving seniority plans. *Id.* at 909–912. This decision by a Court of Appeals reinforces my belief that *Stotts* is inapplicable to the present case.