**VANGUARDS OF CLEVELAND, et al.,**
**Plaintiffs-Appellees,**

**v.**

**CITY OF CLEVELAND, et al.,**
**Defendants-Appellees,**

**and**

**Local Number 93, I.A.F.F., AFL–CIO,**
**Intervenor-Appellant.**

**No. 83–3091.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 22, 1984.

Decided Jan. 23, 1985.

Rehearing and Rehearing En Banc
Denied April 22, 1985.

William L. Summers (argued), Summers, Potts, Kampinski, Brucato, Tittle & White, Blaise A. Brucato, Cleveland, Ohio, for intervenor-appellant.

Edward R. Stege, Jr. (argued), Cleveland, Ohio, for Vanguards.

John D. Maddox, Dale F. Kainski, Irving Berger (argued), Cleveland, Ohio, for City of Cleveland.

Before KENNEDY and CONTIE, Circuit Judges; and COOK, District Judge.*

CONTIE, Circuit Judge.

Intervenor-City of Cleveland Firefighters Association, Local # 93, I.A.F.F., AFL–CIO (Local 93) appeals from the district court's entry of a consent decree which contains a race-conscious, affirmative action plan to increase the number of Black and Hispanic officers within the Cleveland Fire Department. In this appeal, we must first determine whether Local 93 has standing to challenge the consent decree. If standing exists, we must then decide whether the district court abused its discretion by ruling that the decree was "a fair, reasonable and adequate resolution of the claims raised in this action."

## I.

On October 23, 1980, the Vanguards of Cleveland (Vanguards), an association of Black and Hispanic firefighters employed by the City of Cleveland, brought a class action under the thirteenth and fourteenth Amendments, 42 U.S.C. §§ 1981 and 1983, and title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., to redress alleged discrimination by the Cleveland Fire Department in its promotion of minority firefighters. The complaint alleged that the City had maintained its discriminatory promotions policy by (1) the use of unfair written tests and seniority points, (2) the manipulation of retirement dates vis a vis the dates upon which promotional eligibility lists expired, and (3) the City's failure to hold an examination for promotions since April 1975. The complaint further alleged that only 4.3% of the firefighters who had attained the rank of Lieutenant or above were minorities. In their prayer for relief, the Vanguards sought, inter alia, a declaratory judgment that the City had engaged in discriminatory employment practices, an injunction prohibiting the continuation of such practices, and the institution of "an affirmative hiring and promotion program to eliminate the effects of past discriminatory practices."

Shortly after the complaint was filed, counsel for both parties initiated negotiations in an attempt to reach a settlement. In April 1981, Local 93 filed its motion to intervene as of right pursuant to FED.R. CIV.P. 24(a)(2). This motion was granted by the district court on June 5, 1981. Thereafter, Local 93 filed its complaint in which it alleged that it was "the representative of the members of the International Association of Fire Fighters Local # 93 all of whom are employees of the Cleveland Fire Department, any and all of whom may be affected by any decision which may be rendered in the instant lawsuit." The complaint also asserted that "[p]romotions based upon any criteria other than competence, such as a racial quota system, would deny those most capable from their promotions and would deny the residents of the

City of Cleveland from maintaining the best possible fire fighting force."

In November 1981, the Vanguards and the City filed a proposed consent decree with the district court. On January 7–8, 1982, the district court held an evidentiary hearing to consider the intervenor's objections to the decree. At this time, the parties submitted stipulations of fact which indicated that the percentage of minority residents in the City of Cleveland was 46.9% in 1980, but that the percentage of minority firefighters occupying the ranks of Lieutenant or above was only 4.5%. At the close of the hearing, the district judge urged the parties to engage in "some intensive dialogue" in order to resolve their differences. At a second evidentiary hearing held on April 27, 1982, the district court indicated that no agreement had been reached and that the intervenor's primary objection to the decree was its use of racial quotas to alleviate the effects of past discrimination. The court later referred this matter to a magistrate for further negotiations.

On November 12, 1982, the magistrate reported that a tentative agreement among counsel for all parties had been reached. This agreement, however, was later rejected by the membership of Local 93. At that point, the Vanguards submitted another proposed consent decree which had been negotiated only by the Vanguards and the City. This decree contained an affirmative action plan for the promotion of Black and Hispanic firefighters which reads as follows:

7) Defendants shall as promptly as possible, but no later than January 31, 1983, certify promotional eligibility lists based upon the examinations administered in November 1981, heretofore impounded pursuant to Orders of the Court. Based upon those lists the following promotions shall be made no later than February 10, 1983;

    a. Four promotions to the rank of Assistant Chief of Fire.

    b. Sixteen promotions to the rank of Battalion Chief.

    c. Thirty-two promotions to the rank of Captain of Fire.

    d. Sixty-six promotions to the rank of Lieutenant.

8) All minority members who pass the November 1981 examinations for the ranks of Assistant Chief of Fire, Battalion Chief and Captain of Fire shall be so appointed.

9) The sixty-six promotions to the rank of Lieutenant shall be made on the basis of one non-minority to one minority appointee, based on the relative eligible list ranking of the individuals, a minority and non-minority appointment being coupled. Should there be less than thirty-three minority candidates selected for appointment, all sixty-six appointments shall be made, the balance to be filled by non-minority candidates. Any such shortfall as to minority appointments to the rank of Lieutenant shall be made up by promoting, upon the determination of the Defendants that promotion should be made, an equivalent number of minority candidates from the 1984 eligible list as provided for in paragraph 11 hereof, before any further appointments are made from that list.

10) The promotions to be made to the ranks of Assistant Chief of Fire, Battalion Chief and Captain of Fire shall be made by coupling the highest ranking non-minority and minority appointees, until all successful minority candidates have been appointed.

11) The eligible lists resulting from the 1981 examinations shall remain in effect until June 15, 1984. Defendants shall schedule additional promotional examinations in sufficient time to promulgate eligible lists to be certified as of June 16, 1984. The eligible lists resulting from the 1984 examinations shall remain in effect until December 15, 1985. Defendants shall schedule additional promotional examinations in sufficient time to promulgate eligible lists to be certified as of December 16, 1985. The eligible lists resulting from the 1985 examinations shall remain in effect for two years.

12) Seniority within grade shall continue to be determined by the date of appointment. For purposes of determining seniority ranking of persons receiving their appointment on the same day, seniority shall be determined by their respective ranking on the eligible list from which such promotion was made. For purposes of determining the seniority of those persons coupled for appointment in 1983 pursuant to this Decree, their seniority shall be based upon the order of their appointment from the eligible list regardless of their actual ranking on the eligible list. Any Lieutenants appointed in 1984 pursuant to the shortfall provision of Paragraph 9 shall be the most senior appointees from that list, and shall be ranked among themselves according to their respective ranking on the 1984 list.

13) In making promotional appointments in such numbers as are deemed appropriate by the City, and consistent with paragraph 15 hereof, Defendants shall maintain the following minority representation incident to the administration of the 1984 and 1985 promotional examinations provided for herein. Following the certification of the 1984 eligible lists the goals shall be 20 percent for Assistant Chief, 10 percent for Battalion Chief, 10 percent for Captain and 23 percent for Lieutenant during the duration of those lists. Following certification of the 1985 eligible lists the goals shall be 20 percent for the ranks above Lieutenant and 25 percent for the rank of Lieutenant during the duration of those lists. For the examinations after the 1981 examinations, if there are less than a sufficient number of minority candidates on the eligible lists to permit Defendants to meet the goals stated herein, promotions will be made by Defendants as determined by them to be necessary for the operation of the Division of Fire, and such promotions shall be made from eligible non-minority candidates and there shall be no shortfall carry-over to subsequent examinations.

14) Should more minority candidates qualify for promotion as a result of the three examinations referred to herein than would be subject to promotion by virtue of the terms of this decree such individuals shall be promoted based upon their eligible list ranking. No promotions shall be made or withheld based upon racial considerations other than as required to comply with the terms of this decree.

On January 19, 1983, the district court directed all parties who objected to the proposed consent decree to submit their objections in writing and to show cause why the court should not approve the proposed decree. Local 93 filed a formal objection in which it reiterated its "absolute and total objection to the use of racial quotas...."

On January 31, 1983, the district court adopted the proposed consent decree. The court first found that "[t]he documents, statistics and testimony presented at the January and April 1982 hearings reveal a historical pattern of racial discrimination in promotions in the City of Cleveland Fire Department." The court then found that the affirmative action plan incorporated within the proposed consent decree was not an unreasonable remedy in light of this discrimination. Accordingly, the court adopted the consent decree "as a fair, reasonable, and adequate resolution of the claims raised in this action." Intervenor appeals.

II.

At the outset, the City contends that Local 93 has no standing to appeal the consent decree because the decree neither interferes with any legal relationship between Local 93 and the settling parties nor binds Local 93 in any other way. *See Utility Contractors Association of New Jersey, Inc. v. Toops,* 507 F.2d 83, 85–86 (3d Cir.1974). Absent such a relationship, the City reasons, Local 93 is, in effect, an *amicus curiae* who has set forth the view of a majority of its members that the affirmative action plan is inappropriate.

We acknowledge that an appealable order may not be challenged by the world at large or even by every party to the suit in which it is entered. It does not follow, however, that a party lacks standing to appeal the entry of a consent decree simply because it is not formally bound or restricted by the agreement. To have standing, a party must be aggrieved by the judicial action from which it appeals. *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980); *Machella v. Cardenas,* 659 F.2d 650, 652 (5th Cir.1981). In addition, this circuit has ruled that a consent decree may be challenged only on the ground that its substantive provisions unlawfully infringe upon the rights of the complainant. *Stotts v. Memphis Fire Department,* 679 F.2d 541, 558 (6th Cir.1982), *reversed on other grounds,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

It may well be that no legally protected interests of non-minority firefighters are adversely affected by this consent decree. For standing purposes, however, this analysis places the cart before the horse. In the present case, regardless of how moderate the preference given to the plaintiff class, and how modest the detriment placed upon the intervenor class, there will be *some* detriment to the latter group. Accordingly, we hold that this intervening party has been sufficiently aggrieved by the district court's order to have standing to challenge the consent decree on the grounds that it unlawfully infringes upon the constitutional rights of the non-minority firefighters. *See Kirkland v. New York State Department of Correctional Services,* 711 F.2d 1117, 1126 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *Stotts,* 679 F.2d at 558–59.

### III.

A consent decree, although founded on an agreement of the parties, is a final judgment. *Williams v. Vukovich,* 720

F.2d 909, 920 (6th Cir.1983). When presented with a proposed consent decree, the district court must ascertain only that the settlement is fair, adequate and reasonable. *Id.* at 921. In making this determination, the court must consider, *inter alia,* whether the affirmative action plan is reasonably related to the objective of remedying prior discrimination and whether the plan is fair and reasonable to non-minorities who may be affected by it. *Bratton v. City of Detroit,* 704 F.2d 878, 887 (6th Cir.), *modified on rehearing,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). A consent decree may not embody an affirmative action plan unless the employer has utilized minorities at a rate less than their proportion in the relevant labor market. *Williams,* 720 F.2d at 921–22. The plan itself cannot require the discharge of non-minority workers and their replacement with minorities. *See United Steelworkers of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979).[1] The plan also cannot create an absolute bar to the advancement of non-minority employees. *Id.* Finally, the decree must be temporary in nature and must terminate when the underutilization of minorities has been corrected. *Id.* Once the district court approves the consent decree, its decision will be reviewed by this court under the abuse of discretion standard. *Stotts,* 679 F.2d at 555.

Local 93 does not contest the district court's finding of racial discrimination and thus does not deny the existence of a substantial state interest in some remedial action. *See Bratton,* 704 F.2d at 886. Local 93 does contend, however, that this affirmative action plan is unreasonable because it penalizes innocent non-minority firefighters.

This circuit has repeatedly indicated that a simple reduction in non-minority "expectations" does not necessarily make a consent decree unfair or unreasonable. *Williams,* 720 F.2d at 922. Since non-mi-

---

**1.** Although *Weber* is a title VII case, this court has used the *Weber* analysis in its discussion of a fourteenth amendment claim. *See Bratton,* 704 F.2d at 887.

norities do not have a legally protected interest in promotions which could only be made pursuant to discriminatory employment practices, it follows that the legal rights of non-minorities will not be adversely affected by *reasonable* and *lawful* race-conscious hiring or promotional remedies. *Kirkland,* 711 F.2d at 1126. For the reasons set forth below, we hold that the district court did not abuse its discretion in finding that the consent decree was fair, reasonable and adequate.

■ The statistical evidence of promotion practices within the Cleveland Fire Department, combined with the City's admission in the consent decree of past discrimination in its hiring and promotion of minority firefighters, clearly established a substantial state interest in some remedial action. The affirmative action remedy embodied in the consent decree is, in our opinion, fair and reasonable to the non-minority firefighters. *See Bratton,* 702 F.2d at 887. The relatively modest goals set forth in the plan represent a permissible and effective means for the City to achieve its constitutionally permissible ends within the foreseeable future. Moreover, the plan does not require the hiring of unqualified minority firefighters or the discharge of any non-minority firefighters. The plan also does not create an absolute bar to the advancement of non-minority employees. During the first stage of the plan, all promotions are to be made by coupling the highest ranking non-minority and minority candidates based upon the relative eligible list rankings. Thereafter, the City must maintain a specified percentage of minority firefighters at each grade level pursuant to the administration of future promotions examinations. The plan also provides, however, that these percentages are subject to modification if there is an insufficient number of qualified minority candidates:

For the examinations after the 1981 examinations, if there are less than a sufficient number of minority candidates on the eligible lists to permit Defendants to meet the goals stated herein, promotions will be made by Defendants as determined by them to be necessary for the operation of the Division of Fire, and such promotions shall be made from eligible non-minority candidates and there shall be no shortfall carry-over to subsequent examinations.

Finally, the affirmative action plan will remain in effect for only four years, which indicates that the plan "is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *Weber,* 443 U.S. at 208, 99 S.Ct. at 2730.

Local 93 also contends that the plan is unnecessary because there already exists an entry-level affirmative action plan "which will, within the time period contemplated by the decree, operate naturally to increase minority representation within the fire department's upper ranks." As the number of minority firefighters increases, the Union reasons, the number of minority officers will likewise increase.

■ We reject the argument that a district court may not authorize an affirmative action plan to end the present effects of past racial discrimination simply because other measures *may,* over the course of future years, achieve the same result. Such reasoning is entirely too speculative given the "historical pattern of racial discrimination in promotions in the City of Cleveland Fire Department." The district court has determined that this affirmative action plan is reasonably related to the remedial purpose of correcting the racial imbalance in the firefighters' supervisory ranks. The court has also determined that the plan will achieve this result without trammeling the interests of the non-minority firefighters. Upon careful consideration, we hold that the district court did not abuse its discretion in approving the proposed consent decree.

### IV.

After hearing oral argument in this case, the Supreme Court handed down its decision in *Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Concerned with the potential impact of *Stotts,* we ordered the

parties to submit supplemental briefs addressing the effect, if any, of *Stotts* on this appeal. After considering the supplemental briefs, we conclude that *Stotts* has no effect on this case.

The controversy in *Stotts* involved which employees would first be laid off in the Memphis Fire Department. A prior consent decree had instituted a plan to remedy past discrimination by setting goals for the hiring and promotion of minorities. *See id.*, 104 S.Ct. at 2581. Due to a "budgetary shortfall," *id.*, the City of Memphis was forced to layoff personnel in many of its departments, including the Fire Department. The City announced its intention to layoff employees on a "last hired, first fired" basis in accordance with the City's seniority system. *Id.* at 2581–82. The district court enjoined the City from doing so. The Supreme Court succinctly stated the issue in *Stotts* as "whether the District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority." *Id.* at 2585 (footnotes omitted).

On the facts alone, *Stotts* is distinguishable from this case. In *Stotts*, the district court's action had the direct effect of abrogating a valid seniority system to the detriment of non-minority workers. In this case, the consent decree assured the integrity of the existing seniority system. In the past, employees with greater seniority were given a slight advantage in the promotional process. This is the only point at which a seniority system has any bearing on this case. This benefit of seniority is, however, maintained by the consent decree. Paragraph five of the decree provides, in part: "Seniority points *will continue to be used as criteria for promotion* for the examinations specified in Paragraph 11, jurisdiction being reserved in the Court to determine, upon motion of any party, the

propriety of their use thereafter."[2] The consent decree in this case, unlike the injunction in *Stotts*, plainly does not interfere with any seniority rights.

Another point of distinction removes this case beyond the pale of *Stotts* altogether. The district court in *Stotts* ordered, over the objection of the City, that the seniority system be ignored in executing layoffs. The Supreme Court expressly rejected any construction of the previous consent decree which would have required the City to layoff non-minorities first. *See id.* at 2585–86. In contrast, the City of Cleveland has agreed to the plan adopted in this case. The fact that this case involves a consent decree and not an injunction makes the legal basis of the *Stotts* decision inapplicable. That cases like the present one are different from cases like *Stotts* was recognized in the *Stotts* opinion itself:

> [T]he Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally could have done by way of adopting an affirmative action program. Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objection.

*Id.* at 2590 (footnote omitted).

*Stotts* relied principally on two provisions of title VII, § 703(h) and § 706(g).[3] Both of these provisions, however, merely limit a court's power to award certain relief. Neither makes any conduct illegal. In short, these sections provide a shield to an employer in defending a title VII action, not a sword to an employee claiming that certain conduct violates title VII.

Section 703(h) provides, in part, that "it shall not be an unlawful employment practice" for an employer to differen-

---

**2.** Since the district court has not yet exercised the jurisdiction it reserved to "determine ... the propriety" of the use of seniority credit, it is unnecessary, indeed inappropriate, to address

any actions the district court *might* take in the future under that reservation of power.

**3.** These sections are codified respectively as 42 U.S.C. § 2000e–2(h) and 42 U.S.C. § 2000e–5(g).

tiate between employees on the basis of a "bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production." [4] It does not state that an employer is required to make such differentiations. In short, an employer does not, by the mere force of § 703(h), violate title VII by failing to adhere to the procedures *permitted* by that section.

■ Similarly, § 706(g) merely provides that "[n]o *order of the court shall require*" an employer to give relief to an employee who suffered adverse job action if the action was taken "for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title." [5] By its very terms, this section provides a limit only on a court's power to award relief. It does not forbid an employer from engaging in certain actions but

rather limits what an employer may be forced to do. The quotations in *Stotts* from the legislative history of § 706(g) support our conclusions. These quotations consistently refer to limitations on a court's power to "order" or "require" certain action of an employer; they do not address what action an employer may take voluntarily. *See Stotts*, 104 S.Ct. at 2589-90: [6]

*Stotts* must also be read in light of *Weber*. *Weber* held that an employer does not violate title VII by voluntarily adopting a reasonable race-conscious plan to increase minority employment, even when the plan has the effect of overriding the seniority rights of non-minorities. *See Weber*, 443 U.S. at 208-09, 99 S.Ct. at 2729-30. Given this holding, *Weber* precludes any notion that title VII absolutely forbids voluntary action by an employer to the detriment of the seniority rights of non-minority work-

**4.** Section 703(h) reads in full:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such diffeerences [sic] are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.

*See* 42 U.S.C. § 2000e-2(h).

**5.** Section 706(g) provides in full:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

ate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.
*See* 42 U.S.C. § 2000e-5(g).

**6.** *Stotts* also relied on two cases construing these provisions of title VII, *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Both of these cases concerned only the remedial powers of a court in a coercive action. Neither case considered the power of an employer to implement voluntarily a hiring or promotion plan.

ers. To read *Stotts* as invalidating the present plan as impermissible under title VII is to conclude that *Stotts* sub silentio overruled *Weber*.[7] We believe that the Court would have expressly addressed *Weber* had it intended to overrule that decision.[8]

Our colleague in dissent would apparently agree that if this case may be categorized as involving voluntary as opposed to court-ordered action, *Stotts* would not affect our decision. The point of disagreement is whether, as the dissent puts it, this case "should be governed by the principles applicable to court-ordered relief." *See post* at 489.

The dissent's conclusion that those principles are applicable is based on the proposition that a consent decree may not embody provisions that could not be ordered by a court in a wholly coercive action under title VII. Although it is admitted that the Court in *Stotts* "was not directly faced with the question of whether adoption of a consent decree is limited by the remedies available under the statute being enforced," the proposition upon which the dissent relies is said to be a "necessary postulate from which the Court reached its holding." *See post* at 491.

It is by no means clear that the majority in *Stotts* ever reached this conclusion. The majority did quote from *System Federation No. 91 v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961), to support its statement that "the District Court's authority to impose a modification of a decree is not wholly dependent on the decree." *See* 104 S.Ct. at 2587 n. 9. The *Stotts* majority nowhere says, however, that consent decrees must strictly conform to the scope of relief available to a court in a wholly coercive action; it merely states that "a district court cannot enter a *disput-*

ed modification* of a consent decree in Title VII litigation if the resulting order is inconsistent with that statute." *Id.* (emphasis added). In any event, the *Wright* case involved a decree which had become patently inconsistent with the substantive policy of the underlying statute, a situation far different from the one now before this court. The language from *Wright* on which the dissent relies does not bar a court from adopting a consent decree which provides relief beyond that authorized in the underlying statute.

> The rule contended for by the Companies depends on an overly literal reading of *System Federation No. 91 v. Wright.* The statement that a district court's "authority to adopt a consent decree comes only from the statute which the decree is intended to enforce" ... means only that the focus of the court's attention in assessing the agreement should be the purposes which the statute is intended to serve, rather than the interests of each party to the settlement.

*Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1118, 1125 (D.C.Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984) (citation omitted).[9] Indeed, other courts have flatly rejected the dissent's position: "Consent decrees need not be limited to the relief that a court could provide on the merits." *See Sanson Committee v. Lynn*, 735 F.2d 1535, 1538 (3d Cir.1984) (citing *Pacific Railroad v. Ketchum*, 101 U.S. (11 Otto) 289, 297, 25 L.Ed. 932 (1879)). *See also Sansom*, 735 F.2d at 1547 (Garth, Circuit Judge, dissenting) ("the consent decree may even prescribe relief beyond that authorized by the statute").

Moreover, if the *Stotts* majority meant to say what the dissent believes it said, it is

---

7. *Stotts* did not conclude that the district court's injunction was unreasonable, but rather that it was impermissible whether it was reasonable or not. Thus, to apply *Stotts* to voluntary employer plans would mean that all such plans are impermissible under title VII no matter how reasonable. This reading of *Stotts* is directly contrary to *Weber*.

8. Indeed, as noted above, the Supreme Court expressly declined to address the question presented in cases like *Weber* and the present one. *See Stotts*, 104 S.Ct. at 2590.

9. *Gorsuch* upheld a consent decree which contained provisions that went "beyond statutory requirements" against a challenge to its propriety under *Wright. See* 718 F.2d at 1125.

hard to explain the majority's statement that "it is reasonable to believe that the 'remedy', which it was the purpose of the decree to provide, would not exceed the bounds of the remedies that are appropriate under Title VII, *at least absent some express provision to that effect." See id.,* 104 S.Ct. at 2586 (emphasis added). If it was a "necessary postulate" for *Stotts* that consent decrees must strictly conform to court-ordered title VII remedies, then the majority surely would have simply said so when discussing whether the initial decree supported the injunction. Instead, it believed it necessary to construe the decree to not include remedies beyond those which a court may order. Finally, although the majority in *Stotts* was somewhat ambiguous on this point, the three dissenters and Justice Stevens were not. They unequivocally rejected our colleague's position. *See* 104 S.Ct. at 2594 n. 3 (Stevens, J., concurring); *id.* at 2605 n. 9 (Blackmun, J., dissenting).

That *Stotts* looked to the limits of a court's powers under title VII is not surprising, since the City strenuously objected to the court's action. In *Stotts,* the decree was essentially coercive and consensual in name only. Accordingly, the Court did not analyze the case as involving voluntary action. In the present case, the decree reflects voluntary action [10] and must be analyzed as a voluntary action case.

Since nothing in title VII, as interpreted in *Stotts,*[11] forbids this consent decree and since, as we have already determined, *see supra* at 484–85, the decree is proper under the standards recognized in cases such as *Bratton,* the judgment of the district court is AFFIRMED.

**10.** To be sure, a consent decree is a judicial "order" and may not be inconsistent with the underlying statute. It is one thing, however, to say that decrees must be consistent with the underlying statute and quite another to say that they must mimic court-ordered remedies in every particular. If the decree had contained a remedy which violated non-minorities' rights under title VII, it plainly would have been inconsistent with the statute. Since this plan is within the limits set in *Weber* (and those set in cases such as *Bratton,* where the fourteenth amendment is relevant), however, it does no violence to non-minorities' legal rights.

KENNEDY, Circuit Judge, dissenting.

In *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), the Supreme Court held that when fashioning relief for a violation of Title VII a court was limited to making whole those found to have been victims of past discrimination. Relief thus could not be given based merely on membership in the disadvantaged class. The Court explicitly left open the question of whether the employer could, without violating Title VII, voluntarily adopt an affirmative action program offering benefits based on membership in the disadvantaged class. 104 S.Ct. at 2590. The majority reasons that since two of the parties in the present case agreed to entry of the consent decree, this case is identical to the voluntary action situation the Supreme Court declined to address in *Stotts* but which is controlled by prior decisions of this Circuit. I dissent because the language and reasoning of the Supreme Court in *Stotts* indicate that the consent decree in the present case should be governed by the principles applicable to court-ordered relief rather than those applicable to purely voluntary actions.

In *Stotts* the Supreme Court reviewed a District Court order preliminarily enjoining the City of Memphis from following its established seniority system when laying off firefighters. The District Court had earlier entered a consent decree for the purpose of remedying a pattern or practice of discrimination on the basis of race in hiring and promotion in violation of Title VII. The Court first rejected the position, accepted by this Circuit, that the injunction did no more than enforce the consent decree. 104 S.Ct. at 2585–86. The Court then agreed with this Circuit that the injunction was not needed to prevent a new

**11.** We also note that our reading of *Stotts* is consistent with *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1157–58 (6th Cir.1984).

violation of Title VII, since the city's layoff plan was pursuant to a bona fide seniority system and thus did not constitute an unlawful employment practice under § 703(h) of Title VII. 104 S.Ct. at 2587. Finally, the Court considered this Circuit's reasoning that the entry of a consent decree should not restrict a court's authority to order further relief necessary to correct a past violation of Title VII. The Supreme Court also rejected this argument because, relying on *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and § 706(g) of Title VII, it concluded that if the case had gone to trial and the plaintiffs had proven discrimination the District Court could not have awarded relief based on "mere membership in the disadvantaged class." 104 S.Ct. at 2588–90.

This holding compels the conclusion that if the present case had gone to trial and the plaintiffs had proven a pattern or practice of discrimination in promotions in violation of Title VII, the District Court could not have ordered relief equivalent to the provisions of the consent decree. Contrary to the majority's suggestion, majority opinion at 486–87, this case cannot be distinguished from *Stotts* on the grounds that *Stotts* involved abrogation of a seniority system while this case does not. The consent decree in this case in effect gives minority firefighters superseniority over all non-minority firefighters for promotion purposes, at least until certain quotas are reached. Before the decree, promotions were based on a combination of factors that included seniority and examination scores. The decree now requires that minority firefighters who pass the examination be promoted ahead of non-minority firefighters who would otherwise be entitled to promotion by virtue of their seniority and examination scores. Each promotion list, based in part on seniority, has been split into two. It therefore cannot be said that the consent decree "plainly does not interfere with any seniority rights."

More importantly, the rationale of the Supreme Court in *Stotts* is in no way limited to orders that award competitive seniority. The Court in both *Stotts* and *Teamsters* relied on § 706(g) of Title VII, which limits the relief that may be ordered to remedy a Title VII violation. That section provides in part:

> No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination....

42 U.S.C. § 2000e–5(g). The language of this section applies equally well to the Cleveland Fire Department's promotional system as it did to the layoff plan in *Stotts* or the job allocation system in *Teamsters*. The consent decree requires that minority firefighters be promoted even though those firefighters may have been refused advancement for only non-discriminatory reasons.

The Supreme Court relied on § 706(g)'s policy "to provide make-whole relief only to those who have been actual victims of illegal discrimination." *Stotts*, 104 S.Ct. at 2589. The provisions of the consent decree in the present case clearly provide make-whole relief to those who have not been victims of illegal discrimination. Many of the minority firefighters affected by the decree had never been eligible for promotion before the decree was entered, and thus could not have been the victims of discrimination in promotions. If this case had gone to trial, therefore, it is clear that the District Court could not have ordered such blanket relief.

The question presented by this case, therefore, is whether the District Court could adopt provisions in a consent decree purporting to remedy a Title VII violation that it would have had no authority to order as a remedy had the matter gone to trial.

The answer to this question may be found in the Supreme Court's opinion in *Stotts.* In a footnote, the Court stated that:

> the District Court's authority to impose a modification of a decree is not wholly dependent on the decree. "[T]he District's [*sic*] Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce," not from the parties' consent to the decree. *System Federation No. 91 v. Wright,* 364 U.S. 642, 651 [81 S.Ct. 368, 373, 5 L.Ed.2d 349] (1961).

104 S.Ct. at 2587 n. 9.[1]

*System Federation* involved a suit brought under the Railway Labor Act, which then prohibited employer discrimination against non-union employees. The defendants, a railroad and several unions, agreed to entry of a consent decree providing that the railroad would not discriminate against non-union employees. The statute was then amended to permit such discrimination in the form of a union shop. Upon request of the unions, the District Court refused to modify the consent decree to allow a union shop, reasoning that non-union shops were not illegal and that the parties' agreement should be enforced. The Supreme Court reversed, holding that to allow the consent decree to continue unmodified "would be to render protection in no way authorized by the needs of safeguarding statutory rights." 364 U.S. at 648, 81 S.Ct. at 371–72. The Court reasoned that "[t]he parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction."

364 U.S. at 651, 81 S.Ct. at 373.[2] The Court quoted its decision in *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932): "The result is all one whether the decree has been entered after litigation or by consent.... We reject the argument ... that a decree entered upon consent is to be treated as a contract and not as a judicial act." 364 U.S. at 650–51, 81 S.Ct. at 373.

The Supreme Court in *Stotts* was not directly faced with the question of whether adoption of a consent decree is limited by the remedies available under the statute being enforced. The Court did, however, use the proposition that a consent decree is so limited as a necessary postulate from which the Court reached its holding that modification of a decree over an objection is so limited. The three dissenting Justices and one concurring Justice in *Stotts* interpreted the majority opinion as saying that a consent decree cannot provide relief that would be unavailable after trial. *See Stotts,* 104 S.Ct. at 2605 n. 9 (Blackmun, J., dissenting) ("The Court's analysis seems to be premised on the view that a consent decree cannot provide relief that could not be obtained at trial."); *Stotts,* 104 S.Ct. at 2594 n. 3 (Stevens, J., concurring in the judgment) ("The Court seems to suggest that a consent decree cannot authorize anything that would not constitute permissible relief under Title VII."). That five Justices nonetheless joined the opinion of the Court,[3] despite knowing of this interpretation of their opinion, indicates that the Court meant what it said.[4]

---

1. This principle has previously been recognized by this Circuit in *Williams v. Vukovich,* 720 F.2d 909, 923 (6th Cir.1983): "A consent decree which seeks to enforce a statute must be consistent with the public objectives sought to be attained by Congress."

2. I do not interpret *System Federation* to require that before entering a consent decree a district court must resolve the merits of the dispute and find that the terms of the consent decree would in fact have constituted an appropriate remedial order. *See Swift & Co. v. United States,* 276 U.S. 311, 327, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928) (failure to establish that violation actually oc-

curred before entry of consent decree "does not go to the power of the court to adjudicate between the parties"). Section 706(g), in contrast, expressly limits the *power* of a court to order relief of a certain type under *any* circumstances.

3. Justice O'Connor, who joined in the opinion of the Court, specifically voiced her agreement with the Court's application of Title VII to limit proper modifications of the consent decree. 104 S.Ct. at 2593 n. 2 (O'Connor, J., concurring).

4. The majority finds it "hard to explain" the Supreme Court's failure in *Stotts* to note Title VII's limitations on permissible court orders

492

The rationale used by the Supreme Court in *Stotts* applies equally as well to a consent decree as to an injunction following trial. The Court relied on § 706(g) of Title VII, which provides that *"[n]o order of the court"* shall provide relief to employees not affected by discrimination. (Emphasis added.) Contrary to the majority's suggestion, opinion at 487–88, the consent decree in this case is clearly an "order of the court." This Circuit said in *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983), that "[a] consent decree, however, is also a final judicial order." The decree on its face recites, "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED," and then explains in detail what actions the defendants are required to take to comply with the order. That the defendants agreed to entry of the order does not make it any less an order.

The adoption of the agreement as a judicial decree has different consequences than voluntary compliance with the agreement. Any failure to comply with the decree is enforceable through contempt proceedings, rather than a suit for breach of contract. The District Court retains continuing jurisdiction to interpret and modify the decree. The decree also affects the rights of the firefighters' union and non-minority firefighters. A non-minority firefighter could challenge the city's voluntary actions on equal protection or Title VII grounds, but is foreclosed from collaterally challenging a court decree. Under Ohio's public employees collective bargaining law, effective April 1984 (after the consent decree was entered), voluntary changes in the city's promotion policy might be subject to collective bargaining with a certified representative. Ohio Rev.Code §§ 4117.01–.23. A city could avoid its duty to bargain by seeking adoption of a consent decree. While a consent decree does have some aspects of an agreement, there can be no doubt that a consent decree is not identical to a voluntary action.

The differences between a purely voluntary affirmative action plan and a court-ordered plan were made evident by this Circuit's decision on rehearing in *Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.), *modified on reh'g,* 712 F.2d 222 (6th Cir. 1983). In *Bratton* non-minority employees challenged a voluntary affirmative action promotions plan. The District Court not only upheld the plan but incorporated it into a decree. This Circuit on rehearing vacated the decree because what the city should be *required* to do was not at issue, and was not necessarily coextensive with what the city would be *permitted* to do. This Court reasoned that the body adopting the plan "must remain the 'front line actor' primarily responsible for the plan's operation." 712 F.2d at 223. *Bratton* therefore is consistent with my conclusion that a court decree, even when it incorporates an affirmative action plan voluntarily agreed to, nonetheless is improper unless it is based on what the employer may be *required* to do as a remedy for past discrimination.

In addition to the language of § 706(g), the Supreme Court in *Stotts* relied on Title VII's legislative history. The Court quoted remarks of Senator Humphrey:

Contrary to the allegations of some opponents of this title, there is nothing in it that will give any power to the Commission or to any court to require [hiring,] firing [, or promotion] of employees in order to meet a racial "quota" or to achieve a certain racial balance.

104 S.Ct. at 2589 (quoting 110 Cong.Rec. 6549 (1964)) (bracketed words Sen. Humphrey's omitted by Supreme Court.) This passage makes it clear that § 706(g) was

during its discussion of whether the initial decree in *Stotts* supported the trial court's ruling. Majority opinion at 488. The statement in *Stotts* quoted by the majority was made entirely within the context of a discussion of what the parties' intentions were in agreeing to the initial decree. Whether the parties so agreed is entirely a different question than whether a court had the power to enforce that agreement by entering a decree.

intended to limit the *power* of a court to require certain actions, not just the scope of remedies that a court must impose. Section 706(g) thus limits the power of the District Court to require a quota-based promotion policy.

When a voluntary affirmative action program is challenged under Title VII, a court need answer only one question: whether that program itself violates Title VII. This is the question addressed in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) and left unanswered in *Stotts*. When a court-ordered remedy for a prior Title VII violation is challenged under Title VII, however, two questions must be addressed: (1) whether the remedy itself violates Title VII; and (2) whether the remedy is within the scope of relief permissible under § 706(g) to correct a Title VII violation. The majority in this case has failed to address the second of these questions. Section 706(g) does indeed provide a "shield" rather than a "sword" in a Title VII action,[5] see majority opinion at 486, but a shield is precisely what the intervenors in this case need to challenge the District Court's power to award relief. Under the Supreme Court's decision in *Stotts*, a court may not enter relief of the type embodied in the consent decree in this case. Since the power to enter a consent decree purporting to enforce a statute is drawn from that statute, it is incongruous to approve a consent decree that goes far beyond the scope of relief permissible under the statute. Accordingly, the District Court's judgment adopting the consent decree should be reversed and the case remanded for further proceedings in accordance with this opinion.

I concur in part II of the majority opinion, which concerns standing. Otherwise, I respectfully dissent.

**5.** Section 706(g) does, however, provide a much different type of shield than does § 703(h). Section 703(h) provides that application of a bona fide seniority system does not constitute an unlawful employment practice, and thus is

relevant to the question of whether a Title VII violation has occurred. Section 706(g), in contrast, limits the type of relief that may be ordered once a violation has been established.