**Tilford YOUNGBLOOD, et al., Plaintiffs,**

v.

**John DALZELL, et al., Defendants.**

**Civ. A. No. 8774.**

United States District Court, S.D. Ohio, W.D.

July 8, 1985.

Paul Nemann, Ronnie Dixon, John Schrider, Legal Aid Society, Cincinnati, Ohio, for plaintiffs.

Michael A. Esposito, Asst. Atty. Gen., Civil Rights Section, Columbus, Ohio, for intervenor Ohio Civil Rights Com'n.

James W. Hengelbrok, Cincinnati, Ohio, for intervenor Firefighters Union.

M. Kathleen Robbins, Asst. City Sol., Cincinnati, Ohio, for defendants.

William S. Wyler, Cincinnati, Ohio, for proposed intervenors Gerald G. Hehn, Albert E. Cigolotti, Bennie Sheppard.

DAVID S. PORTER, Senior District Judge.

This matter is before the Court on plaintiffs' motion for enforcement of consent decree (doc. 170), defendant's memorandum in response (doc. 172), defendant's brief (doc. 178), plaintiffs' reply to intervenor-union's motion opposing enforcement (doc. 179), intervenor's substituted brief in opposition (doc. 181), and plaintiffs' post-hearing memorandum (doc. 183). A hearing on the motion to enforce the Consent Decree was held June 25, 1985. At the hearing, plaintiffs requested that some of intervenor's exhibits be excluded from evidence on grounds of irrelevancy and hearsay. The Court now overrules all those motions.

FACTS

This case originated in 1973 when plaintiffs filed a civil rights class action alleging that the City of Cincinnati was engaged in racially discriminatory recruiting, testing, selecting, and promoting of firefighters in violation of the fourteenth amendment to the United States Constitution and 42 U.S.C. §§ 1981, 1983. On May 7, 1984, without trial of the issues and with no admission of discrimination on the part of the City, the parties entered into a Consent Decree (doc. 39). The Decree set a goal of increasing the percentage of black firefighters from the less than one-half of one percent employed in 1973 to eighteen percent by 1980. When that goal was not met, the Decree was modified to give the City until the end of 1985 to meet the goal (doc. 121).

The Decree also called for efforts to increase the proportion of blacks in the promoted ranks. Paragraph 27 provides:

Defendants shall use a system for promoting qualified minority persons within the ranks of the Division of Fire to achieve a goal of workforce composition which negates any inference of an unlawfully discriminatory promotion policy based on race.

Ohio law requires competitive promotional examinations to establish eligibility lists from which firefighters will be promoted in rank order when vacancies occur. O.R.C. §§ 124.45, 124.46, 124.48. Seniority affects promotions only indirectly. A small seniority credit of one point for each of the first four years of service and six-tenths of one point for each year thereafter is added to the scores on the competitive exam. O.R.C. § 124.45. In the event that two or more people achieve identical scores, seniority will also determine the order in which those people will be ranked. O.R.C. § 124.46. Otherwise persons are simply promoted in rank order during the life of the eligibility list whenever a vacancy occurs.

In September 1984, the City administered a promotional exam for the rank of fire lieutenant. At that time, only five of the 105 lieutenants were black. The eligibility list resulting from the 1984 exam ranked the highest blacks 23rd, 42nd, 43rd, and 67th. To date, nineteen vacancies have occurred in the lieutenant rank and all of those promoted to fill the vacancies have been white. It is likely that during the life of the current list, which expires in September 1986, only one black will be promoted, resulting in continued under-representation of blacks among the lieutenants.

Plaintiffs now request that this Court order that the 1974 Consent Decree requires the City to promote firefighters to the rank of lieutenant so as to result in blacks being promoted in sufficient numbers. Plaintiffs argue that the number of blacks promoted should be equal to the ratio of blacks to whites in the applicant pool. The ratio of blacks to whites in the applicant pool for the current lieutenant eligibility list is one to six (doc. 170, exhibit C). The plaintiffs contend that this result can be achieved by double-filling positions as was done in this case when promotions to the rank of lieutenant were last made (doc. 128). Basically, this procedure would require that every sixth position filled at the rank of lieutenant would be filled with two people—both the highest ranking white person and the highest ranking black person on the eligibility list. The City also supports this procedure for furthering the

goals stated in the Consent Decree (doc. 178).

The Cincinnati Firefighters Union, Local 48 requested and was granted permission to intervene (docs. 171, 175). The union-intervenor opposes the double-filling plan for reasons that will be elaborated below.

DISCUSSION

The issue before the Court is whether paragraph 27 of the Consent Decree requires affirmative action in promotions, and specifically, whether the plan of double-filling proposed by the plaintiffs and defendant is consistent both with the Consent Decree and federal law. For the reasons set forth below, we conclude that double-filling as described in the accompanying Order fulfills the affirmative action requirement of the Decree, and is a permissible method of increasing the number of minorities in the promoted ranks of the firefighters.

I.

This is not the first time that this Court has been faced with this issue and has determined that such relief is appropriate. In 1982, the Ohio Civil Rights Commission, plaintiff-intervenor, sought a similar order of enforcement with regard to the fire lieutenant eligibility list resulting from the City's 1981 promotion examination (doc. 122). Although the firefighters union later unsuccessfully appealed this Court's 1982 Order, at the time of the hearing on that Order the union did not object to the proposed motion (doc. 130 at 8, *et seq.*). In fact, when the Assistant Attorney General stated that he believed, "the proposed order ... effects ... a good balance between the interest of the city, the union, and the Ohio Civil Rights Commission," the union did not object. *Id.* at 3. Moreover, at the 1982 hearing, the union recognized that the costs of complying with the proposed order were "very little" (doc. 130 at 9) and that further litigation of the matter would necessarily involve investigating the validity of the promotion test which would be much more expensive. *Id.* The union acknowledged that the 1982 Order struck a "very

good balance between all of these interests [the city, the Civil Rights Commission and the union] which ... are genuine and sincere interests." *Id.*

Now, however, the union-intervenor opposes enforcement of the Consent Decree as proposed by plaintiffs and defendants (docs. 176, 181). According to the union, paragraph 27 does not mandate affirmative action in the area of promotions, but instead merely sets out a goal of achieving improved minority representation at all ranks. We disagree. The plain meaning of paragraph 27 is that the City will *use* a procedure that will ensure that qualified minority persons are promoted. As will be discussed in greater detail below, the proposed double-filling plan is an acceptable mechanism for achieving greater minority representation in the promoted ranks, and should therefore be the mechanism used in promotions during the remaining life of the 1984 lieutenant eligibility list.

II.

Intervenor union also suggests that relevant federal case law has changed since 1982 so as to make affirmative action such as the double-filling impermissible. The union apparently relies on *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 2576 (1984), in which the Supreme Court held that a court cannot impose a consent decree to award competitive seniority to a minority employee who has not been shown to be an actual victim of discriminatory practices. After careful consideration of *Stotts*, however, we conclude that it is not controlling. Moreover, we have examined other relevant Supreme Court decisions as well as various Sixth Circuit decisions on affirmative action issued since *Stotts*, and we are convinced that the enforcement of the Consent Decree that we have ordered is permissible.

A.

In *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480

(1979) the Supreme Court held that Title VII of the Civil Rights Act of 1964 "does not condemn all private, voluntary, race-conscious affirmative action plans." 443 U.S. at 208, 99 S.Ct. at 2730. Although the Court declined to specify what made an affirmative action plan impermissible, it did note some of the features of the challenged plan that apparently led to the conclusion that it was permissible. For example, the approved plan was a voluntary one, aimed at breaking down racial segregation, a purpose similar to that of the Civil Rights Act itself. The plan was also only a temporary measure intended to eliminate "manifest racial imbalance," not to maintain racial balance. *Id.* Moreover, the plan did not "unnecessarily trammel the interests of the white employees" because it did not require that any white workers be replaced by blacks, nor did it create an "absolute bar" to white employees' advancement. *Id.*

Although these factors are not irrelevant to the instant case, they alone are not dispositive because the present litigation involves constitutional claims under 42 U.S.C. §§ 1981, 1983. The Supreme Court's guidance on such constitutional claims is more diffuse than that concerning Title VII claims, however, and it must be discerned from cases such as *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The United States Court of Appeals for the Sixth Circuit has observed that, "The only clear consensus to be garnered from these various statements is that in any affirmative action program (1) some governmental interest must be served, and (2) the program must somehow be directed toward the achievement of that objective." *Bratton v. City of Detroit,* 704 F.2d 878, 885 (6th Cir.), *modified on rehearing,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

▮ The Sixth Circuit has concluded that the standard established in *Detroit Police Officers Association v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) continues to be applicable in constitutional cases. 704 F.2d at 885. Thus, the fourteenth amendment is not violated if (1) there is a need for remedial measures and a government interest in their implementation, and (2) the proposed remedy is reasonable in light of the circumstances. *Id.* at 886–87.

▮ The need for remedial measures and the government's interest in their implementation are satisfied in the present case. The government clearly has an interest in "ameliorating the disabling effects of identified discrimination." *Id.* at 886, *citing Fullilove v. Klutznick,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring). Although it is not necessary to show past intentional discrimination, some competent governmental body must find that there is a need for remedial measures, and court review of those findings must reveal a sound basis for them. 704 F.2d at 886. The Sixth Circuit has held that a determination of past discrimination by the Detroit Board of Commissioners was sufficient to meet this requirement. *Young,* 608 F.2d at 694.

In the present case, the City of Cincinnati has never admitted past discrimination and its denial of discrimination is expressly embodied in paragraphs 5 and 6 of the Consent Decree (doc. 39). Nonetheless, the City has explicitly expressed its commitment to affirmative action such as that contemplated by paragraph 27 of the Decree (doc. 170, exhibit B). Moreover, the City Council passed a resolution on October 10, 1984 in which it stated that "blacks are under-represented in the promoted ranks within the Fire Division." *Id.* The City's conclusion is supported by statistics provided by the City, indicating that in October 1984 only five of 105 fire lieutenants were black, only three of 137 drivers were black, and all other promoted ranks were completely white (doc. 170, exhibit A). One of the five black lieutenants was recently promoted to captain, making him the only black among the 48 captains (doc. 170 at 3). Therefore, we conclude that there is a dem-

onstrated need for the proposed remedial measures and a government interest in their implementation.

The second aspect of determining the propriety of the plan is to determine whether it is reasonably related to its objectives. The Sixth Circuit has stated that a plan meets this aspect of the test if the non-minority personnel affected are not "unduly stigmatized by the program" and if "the particular program applies the use of racial classifications reasonably." *Bratton*, 704 F.2d at 890. A plan is not stigmatizing if those hired or promoted under it are qualified for the job. *Id.* at 891. The *Bratton* court also suggested that a plan will be found reasonable if (1) it is substantially related to the objective of remedying past discrimination, (2) use of racial classification reflects the only legitimate way of achieving that objective, (3) it is temporary, and (4) it does not unnecessarily trammel the interests of the non-minority group. *Id.* at 892.

Applying these criteria to the present case, we find that the proposed affirmative action plan is non-stigmatizing and reasonable. The plan is non-stigmatizing because all of the blacks who will be promoted under it are qualified for the job, having passed the lieutenant eligibility exam. Moreover, although the candidates are ranked by numerical score, the top ranking candidate's score was only ten points above that of the 34th ranked candidate; less than four points separates the 20th and 40th candidates. Thus, it is hard to argue that the blacks ranked 23, 42 or 43 are not qualified for the job.

Furthermore, the plan uses racial classifications reasonably. The goal of the plan is to increase the representation of minorities in the promoted ranks of the firefighters. The dearth of blacks in those ranks, as outlined above, gives rise to an inference of adverse racial impact in the promotion system, and therefore of past discrimination. *See* EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. 1607.4(D) (1984). Without using racial classifications there would be no way to overcome the effects of this past discriminatory impact. Moreover, the plan is temporary. Contrary to the union's claim that plaintiffs are seeking to make a "permanent institution" of double-filling, this plan will be in effect only for the life of the 1984 lieutenants' eligibility list. Indeed, both plaintiffs and the Court anticipate the day when the Consent Decree itself is implemented fully and this case can be closed.[1]

Finally, the proposed plan is reasonable because it does not unnecessarily trammel the interests of the non-minority groups. No white officers will be replaced by blacks. Nor will any whites be permanently barred from advancement. In fact, there does not appear to be any significant detriment to any non-minority as a result of the proposed double-filling. At most, there might be a brief delay in the promotion of two or three white firefighters, but even this brief delay would only occur at the termination of the 1984 eligibility list when the double-filled positions are being absorbed into the force. Such a modest detriment, should it in fact occur, falls far short of constituting good cause for not implementing the plan. The Sixth Circuit has held that reduction in a non-minority's expectations of promotion is not sufficient to make a consent decree unfair or unreasonable. *Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir.1983). According to the Sixth Circuit, "Since non-minorities do not have a legally protected interest in promotions which could only be made pursuant to discriminatory employment practices, it follows that the legal rights of non-minorities will not be adversely affected by *reasonable* and *lawful* race conscious hiring or promotional remedies." *Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484–85 (6th Cir.1985), *citing Kirkland v. New York State Department of Correctional Services*, 711 F.2d 1117, 1126 (2d

---

1. To that end, this Court will issue periodic show cause orders requiring the parties to demonstrate why the Decree should not end.

Cir.1983). Accordingly, the Sixth Circuit upheld a more intrusive affirmative action plan that had more extensive detriment to whites than the one we now approve. *Vanguards*, 753 F.2d at 484–85. For all of the foregoing reasons, the Court therefore concludes that the double-filling plan is permissible as a necessary remedy in which the government has an interest and which does not stigmatize or unreasonably affect the non-minorities involved.

### B.

Nothing in the Supreme Court's decision, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), changes the above analysis because that decision is clearly inapplicable to the facts before us. *Stotts* involved a district court ordered modification of a consent decree over the objection of one of the parties to the decree. The consent decree had established an affirmative action program aimed at increasing the number of blacks in the Memphis fire department, but it was silent on the subject of layoffs. After the City of Memphis ordered layoffs, the district court ordered that the decree be modified to forbid the City from using its seniority system to the extent that it would result in a decrease in the percentage of black firefighters. Both the City and the union objected to the modification. Although the Sixth Circuit approved the district court action, the Supreme Court invalidated the change. Among the facts that contributed to the Court's conclusion that the modification of the decree should be invalidated were (1) that the decree was silent on layoffs (104 S.Ct. at 2586), (2) that the City opposed the change (*id.* at 2590), (3) that there was no finding of actual discrimination (*id.* at 2588–90), and (4) that the change affected a bona fide seniority system (*id.* at 2587–90).

None of these factors is present in the case before us. The Consent Decree we seek to enforce contains at paragraph 27 an explicit commitment to some form of affirmative action in promotions. Moreover, the City agrees that this is the plain meaning of the paragraph and joins the plaintiffs in supporting the specific procedure of double-filling as the means to accomplish that end. Although there is no finding of actual discrimination, it is unnecessary in this case because this is only an effort to enforce a consent decree voluntarily entered into. Finally, the affirmative action procedure we now approve will have no impact on the seniority system of the firefighters. This is because promotions are not based upon seniority, but on scores achieved in competitive examinations.

Our conclusion that *Stotts* is inapplicable here is buttressed by the Sixth Circuit's consistent conclusion that *Stotts* does not bar voluntary affirmative action plans. In *Wygant v. Jackson Board of Education*, 746 F.2d 1152 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (Mar. 26, 1985), the Sixth Circuit upheld an affirmative action plan that resulted from "voluntary decisions in the collective bargaining process," and which provided that layoffs of minority teachers would be limited in the event of a reduction in force. 746 F.2d at 1158. In *Van Aken v. Young*, 750 F.2d 43 (6th Cir.1984), the Sixth Circuit approved the City of Detroit's voluntary affirmative action plan for hiring minorities, 750 F.2d at 44–45. Finally, in *Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479 (6th Cir.1985), the Sixth Circuit upheld a voluntary consent decree that required the establishment of two separate promotion lists for blacks and whites, with promotions to be made alternately from each list.

All three of these affirmative action plans differed from the situation in *Stotts* because none of them was imposed by the district court over the objection of any of the parties involved. *Stotts* had relied heavily on two provisions of Title VII, § 703(h) and § 706(d), both of which limit a court's power to award particular relief in Title VII cases. Neither of these sections forbids an employer's voluntary actions to provide such relief, however, an issue that the *Stotts* Court explicitly reserved. 104 S.Ct. at 2590. Thus, the law in the Sixth

Circuit clearly is that when a public employer voluntarily agrees to an affirmative action plan involving hiring (*Van Aken*), promotions (*Vanguards*), or layoffs (*Wygant*), it is permissible. As long as the court does not impose a remedy over the objections of one of the parties, *Stotts* is inapplicable. Such voluntary affirmative action plans are constitutionally permissible in the Sixth Circuit.

In addition to limiting the application of *Stotts*, all of the Sixth Circuit opinions discussed above make it clear that the standards for determining the reasonableness of an affirmative action plan remain those applicable in the Sixth Circuit prior to *Stotts*. *See Wygant*, 746 F.2d at 1157–58; *Van Aken*, 750 F.2d at 45; *Vanguards*, 753 F.2d at 487–89. Thus, the standards established in *Weber*, *Young*, and *Bratton* that were discussed above continue to be the operative ones for determining the permissibility of the instant Consent Decree. As we demonstrated already, the plan here approved clearly meets those requirements. Thus, we conclude not only that the double-filling is permissible, but also that voluntary affirmative action is indeed alive and well in the Sixth Circuit.

SO ORDERED.