Wendy WYGANT, Leonard Bluhm, Susan Lamm, John Krenkel, Florence Csage, Karen Smith, Susan Diebold, Deborah Brezezinski, Kathleen Crecine, Gordon Holton, Cheryl Zaski, Robert L. Staska, David P. Kiesel, Paula Janke, Martha Verhoeven, Perry Maynard, Mary O'Dell and Ruth Ann Anderson, Plaintiffs-Appellants,

v.

JACKSON BOARD OF EDUCATION, JACKSON, MICHIGAN, and Richard Surbrook, President and Don Penson, Robert Moles, Melvin Harris, Cecelia Fiery, Sadie Barham, and Robert F. Cole, Defendants-Appellees.

No. 82–1746.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 23, 1984.
Decided Oct. 25, 1984.

Wellford, Circuit Judge, filed opinion concurring in the result.

**1154**

Thomas Rasmusson (argued), Joseph A. Warren, Lansing, Mich., for plaintiffs-appellants.

Jerome A. Susskind, Jackson, Mich., for defendants-appellees.

Before EDWARDS and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge.

This is a school case tangentially involving segregation in public schools—this concerning a formula for layoff of teachers of minority races during economically required reductions in staff. The disputed formula is contained in the collective bargaining contract executed between the Jackson Teachers Association and the Board of Education of the City of Jackson, Michigan. It reads as follows:

> ARTICLE XII.B.1. In the event that it becomes necessary to reduce the number of teachers through layoff from employment by the Board, teachers with the most seniority in the district shall be retained, *except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff.* In no event will the number given notice of possible layoff be greater than the number of positions to be eliminated. Each teacher so affected will be called back in reverse order for positions for which he is certified maintaining the above minority balance. (Emphasis added).

Appellants, who object to the Board's following this provision, contend that the quoted provision violates both federal and state statutory and constitutional provisions, including particularly the fourteenth amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981); 42 U.S.C. §§ 1981, 1983 and 1985 (1976 & Supp. V 1981).

While, at oral argument, this court was advised that due to somewhat improved economic conditions, only one teacher assignment is as a practical matter currently involved, the fundamental dispute over the validity of Art. XII.B.1. is still before us.

The District Judge who heard this case wrote a careful opinion upholding the validity of the layoff system adopted by the School Board and the Federation of Teachers. We quote in part *Wygant v. Jackson Board of Education,* 546 F.Supp. 1195 (E.D.Mich.1982) as follows:

> "Plaintiffs argue first that they are entitled to summary judgment because an employer and a union cannot lawfully negotiate a voluntary affirmative action plan which gives preferential treatment to minorities, where there has been no judicial finding of past employer discrimination. Stated in other words, plaintiffs argue that societal discrimination, as opposed to identifiable employer discrimination, is not a lawful basis for the adoption of a voluntary affirmative action plan.

> *"United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) held that Title VII does not prohibit a private employer from voluntarily adopting an affirmative action plan 'to eliminate conspicuous racial imbalance in traditionally segregated job categories.' 443 U.S. at 209, 99 S.Ct. at 2730. In *Weber,* there was no judicial finding that the private employer, Kaiser Aluminum, had ever engaged in race discrimination. However, Kaiser's work force statistics for the years prior to the adoption of the affirmative action plan pointed up gross disparities between the number of blacks employed by Kaiser and the number of blacks in the relevant labor market. Thus, *Weber* stands for the proposition that Title VII does not require a judicial finding of employer discrimination before a private sector employer may adopt an affirmative action plan.

> *"Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), extended this particular

holding of *Weber* to public sector employers *and* to alleged Constitutional violations.

"In *Young*, the Detroit Police Department, after an internal determination that blacks were underrepresented in the department, voluntarily adopted an affirmative action program which promoted black patrolmen to sergeant ahead of white patrolmen who were higher on the eligibility list. The white officers challenged the affirmative promotion plan on Title VII and Equal Protection grounds. The Sixth Circuit relied on *Weber* to hold that the internal determination of racial disparities justified the voluntary plan, even though there had been no prior judicial determination of race discrimination.

"[D]iscriminatory acts which might not give rise to legal liability may nonetheless be sufficient to justify a voluntary remedial affirmative action plan... As Justice Blackmun noted in his concurring opinion in *Weber*, a preferential hiring plan which seeks to alleviate an imbalance caused by traditional practices of job segregation is a reasonable voluntary response 'whether or not a court, on these facts, could order the same step as a remedy'... Under *Weber*, the district court's holding that 'quota relief, when fashioned by the employer without the assistance and direction of the court, is not permitted ...' ... cannot stand as a matter of law. 608 F.2d at 689–90.

"Having thus held on the Title VII claim, the *Young* court applied the same principle to the Constitutional challenge.

"It was also error to require that there be judicial determination of past discrimination for a state to undertake a race-conscious remedy, as stated by the district court. This requirement would be 'self-defeating' and would 'severely undermine' voluntary remedial efforts. [Citing *Regents of the University of California v. Bakke*, 438 U.S. 265, 364, 98 S.Ct. 2733, 2785, 57 L.Ed.2d 750 (1978)].

"[1] Thus, it appears that plaintiffs' contention that the affirmative action plan at issue here cannot stand because there has been no prior judicial determination

that the defendants engaged in racial discrimination, is without merit. Plaintiffs' motion for summary judgment on this ground is denied.

"b. Constitutionality of Affirmative Action Plan

"Having determined that a judicial finding that defendants engaged in race discrimination is not a prerequisite to adoption of the affirmative action at issue here, the court must still determine whether the plan is one permitted by the Constitution.

"As an initial matter, there must be some evidence that minority teachers have not enjoyed the same representation on the faculty of the Jackson Public Schools as have white teachers. Justice Brennan, for the majority in *Weber*, adhered closely to the facts of that case and framed this requirement in terms of 'conspicuous racial imbalance in traditionally segregated job categories.' 443 U.S. at 209, 99 S.Ct. at 2730. Justice Blackmun, in concurrence in *Weber*, held out for an 'arguable violation' standard. In other words, employers and unions which had committed 'arguable violations' of Title VII would be free to adopt voluntary affirmative action plans without fear of Title VII liability to whites.

"For purposes of the Equal Protection clause of the Constitution, the *Young* court stated this requirement as follows: 'whether "there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access [and promotion] of minorities...,"' 608 F.2d at 694. The standard was adopted directly from the opinion of Justices Brennan, White, Marshall and Blackmun in *Bakke*.

"The *Young* court expressly held that: [I]t was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for 'it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination.' 608 F.2d at 694.

"The reason for this requirement is to permit the court to determine that the purpose of the affirmative action plan is legitimate. *Valentine v. Smith*, 654 F.2d 503, 508 (8th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

"The requirement of some showing of previous underrepresentation of minorities must, of course, be adapted to the facts and circumstances of the particular case. In both *Weber* and *Young* it was appropriate, when searching for evidence of past discrimination, to compare the percentage of blacks in the employer's work force with the percentage of blacks in the relevant labor pool. For example, prior to the adoption of the affirmative action plan challenged in *Weber*, 1.83 percent of Kaiser-Aluminum's skilled workers were black while the relevant work force was 39 percent black. 433 U.S. at 198–99, 99 S.Ct. at 2724.

"However, in the setting of this case, it is appropriate to compare the percentage of minority teachers to the percentage of minority students in the student body, rather than with the percentage of minorities in the relevant labor market. It is appropriate because teaching is more than just a job. Teachers are role-models for their students. More specifically, minority teachers are role-models for minority students. This is vitally important because societal discrimination has often deprived minority children of other role-models. *See, Oliver v. Kalamazoo Board of Education*, 498 F.Supp. 732, 748 (W.D.Mich.1980) ('faculty ought to begin to approximate the percentage of minority students in the district').

"[2] Because of this one vitally important aspect of the teaching profession, the court holds that in applying the *Young* 'substantial underrepresentation' standard, it may compare the percentage of minority faculty with the percentage of minorities in the student body, rather than with the percentage of minorities in the relevant labor pool.[1]

"Applying this standard, it is clear that minority teachers were 'substantially' and 'chronically' underrepresented on the Jackson School District faculty in the years preceding the adoption of the affirmative action plan. In 1953, there were no black teachers and by 1961, only 1.8 percent of the faculty was black. The court has not been provided with figures establishing the percentage of black students in the Jackson School District during these years.

"[3] However, by the school year 1968–69, black students made up 15.2 percent of the total student population, while black faculty members constituted only 3.9 percent of the total teaching staff. While the percentage of minority students remained relatively constant (15.9 percent in 1971), the percentage of minority faculty members increased, but only to 5.5 percent in 1970–71 and 8.3–8.8 percent in 1971–72.[3] These findings were made by the school board and the court holds that the school board was competent to make such findings. *Regents of University of California v. Bakke, supra*, 438 U.S. at 363–64, 98 S.Ct. at 2785; *see also, McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

"[4] The court finds that this is 'substantial' and 'chronic' underrepresentation within the meaning of *Young*. Thus, the Fourteenth Amendment would permit the Jackson School Board and the Jackson Education Association to voluntarily adopt, through collective bargaining negotiations, an affirmative action plan to protect minority teachers from the effects of layoffs.

"The objective of this affirmative action plan to remedy past 'substantial' and 'chronic' underrepresentation of minority teachers on the Jackson School District faculty is plainly constitutional. *Valentine v. Smith, supra*, at 509. Therefore, the only remaining question is whether the means

---

1. We agree with the concurring opinion insofar as it asserts substantial underrepresentation was established by plaintiffs. We find it unneces- sary, however, to reach the question of whether the District Court properly utilized a minority student ratio. No such issue was presented.

adopted by the Jackson School Board to achieve its objective are constitutional.

"[5] The test is one of reasonableness. *Detroit Police Officers' Association v. Young, supra,* at 694, 696. The reasonableness test asks whether the affirmative action plan is 'substantially related' to the objectives of remedying past discrimination and correcting 'substantial' and 'chronic' underrepresentation. *Id.* at 696; *Valentine v. Smith, supra,* at 510; *U.S. v. City of Miami,* 614 F.2d 1322, 1338–40 (5th Cir. 1980). *See also, Regents of the University of California v. Bakke, supra,* 438 U.S. at 359, 98 S.Ct. at 2783, *Fullilove v. Klutznick,* 448 U.S. 448, 482–92, 100 S.Ct. 2758, 2776–2782, 65 L.Ed.2d 902 (1980)."

---

[3] The 8.3 percent figure appears in the affidavit of Susan Diebold, one of the plaintiffs. The other figures appear in the affidavit of Jane I. Phelps, custodian of employment and student records and coordinator of personnel operations for the Jackson Public Schools.

546 F.Supp. at 1199–1202.

We agree with and adopt Judge Joiner's conclusions as stated above.

■ Appellants contend, among other things, that this court's opinion in *Oliver v. Kalamazoo Board of Education,* 706 F.2d 757 (6th Cir.1983) (*Oliver II*) (decided after Judge Joiner's opinion in this case), requires our reversal of the District Court's opinion.

We do not believe that *Oliver II* controls this case. The school board (and the bargaining representative of the teachers) have a legitimate interest in curing the past racial isolation of black teachers in the school system concerned. No undue stigma attaches in the instant case. We recognize that on the record before us, at least one white school teacher, presumably entirely innocent of any racial discrimination, has suffered by being displaced by the plan which plaintiffs attack here. The Supreme Court has, however, previously recognized that "[w]hen effectuating a limited and properly-tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Fullilove v. Klutznick,* 448

U.S. 448, 484, 100 S.Ct. 2758, 2778, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.).

This court's recent opinion in *Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), reaffirming our earlier decision in *Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir. 1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), supports and strengthens the result reached by Judge Joiner.

As was true in the two cases cited above, in our instant case the Board of Education and its bargaining agent had a legitimate interest in the remedial plan which was jointly adopted. Here the school board's interests in eliminating historic discrimination, promoting racial harmony in the community and providing role models for minority students are among the justifications available to support the layoff provisions.

■ Finally, the district judge appropriately held that there was no basis for the exercise of pendent jurisdiction over appellants' state claims upon dismissal of the federal cause of action. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

In this case a local school board and its teacher bargaining representative have adopted a protective collective bargaining contract containing a provision as to teachers in racial minority status. They have done so voluntarily to cure faculty racial imbalance and as a matter of educational policy. We believe that it is within the power and authority of the parties to this agreement so to do, and that their action is in no respect in violation of the United States Constitution or federal law.

The Supreme Court of the United States has just decided *Firefighters Local Union No. 1784 v. Stotts,* — U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), and we have considered the possible impact of this decision upon our instant appeal. We conclude that *Stotts* does not require any revision or change of result in the opinion above. The

affirmative action plan involved in our instant case was not the product of any court order. It resulted from voluntary decisions in the collective bargaining process between the school board and the bargaining agent for the teachers. We do not read *Stotts* as barring this form of affirmative action.

The majority opinion in *Stotts* specifically declined to decide the issue with which we are confronted. It said:

> Finally, the Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally could have done by way of adopting an affirmative action program. Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objection.

—— U.S. at ——, 104 S.Ct. at 2590 (footnote omitted).

Nor does the *Stotts* case overrule *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). This prior Supreme Court decision was relied upon by the District Court in this case. In *United Steelworkers v. Weber*, the Supreme Court declined to "condemn all private, voluntary, race-conscious affirmative action plans." 443 U.S. at 208, 99 S.Ct. at 2729.

It may be appropriate to point out in this context that the collective bargaining contract containing the disputed layoff provision was adopted in 1972. The full provisions which bear on our present discussion are as follows:

> ARTICLE VII.D.1. The Board and the Association, in recognition of the desirability of multi-ethnic representation on the teaching faculty, hereby declare a policy of actively seeking minority group personnel. For the purposes of this contract, minority group personnel will be defined as those employees who are Black, American Indian, Oriental, or of Spanish descendancy. *The goal of such policy shall be to have at least the same percentage of minority racial representation on each individual staff as is represented by the student population of the Jackson Public Schools.*

> ARTICLE VII.D.2. In order that this goal be expeditiously met, it is agreed that, for vacancies in school buildings in which this goal has not been met, the Board will actively seek, recruit, and hire qualified minority teachers for such vacancies. The Board will annually review each individual staff to ensure proper minority representation.

> ARTICLE XII.B.1. In the event that it becomes necessary to reduce the number of teachers through layoff from employment by the Board, teachers with the most seniority in the district shall be retained, *except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff.* In no event will the number given notice of possible layoff be greater than the number of positions to be eliminated. Each teacher so affected will be called back in reverse order for positions for which he is certified maintaining the above minority balance.

The contract containing these provisions, is "a voluntary, race-conscious affirmative action plan." It was adopted by a majority vote of the Jackson Teachers Association as well as by the Jackson Board of Education.

Judge Wellford's concurring opinion concludes "I would AFFIRM the decision that this voluntary affirmative action layoff system, subjected to collective bargaining safeguards, was sufficient to meet the challenge presented by plaintiffs." This is a good summary of this majority opinion's rationale as well as that of Judge Wellford's concurrence. The majority opinion is not, however intended, as Judge Wellford seems to imply, to overrule *Oliver v.*

*Kalamazoo Board of Education,* 706 F.2d 757 (6th Cir.1983), either directly or sub silentio. The agreement which the School Board and the Jackson Teachers Association (set out in full on pages 7 and 8 of this opinion) was *voluntarily* entered into by the Jackson Board of Education and the Jackson Teachers' union. Neither Judge Joiner nor this court has held that its adoption was constitutionally mandated. This opinion does imply that that agreement is constitutionally permissible. It is also a collective bargaining contract enforceable as a voluntary affirmative action plan designed to remedy past obvious race discrimination and to meet the practical problems posed by racial tensions engendered by that history.

What this court ruled in the *Kalamazoo* case was that the District Court did not have the constitutional authority to design and order the remedy of a 20% hiring quota for black teachers disregarding the contractual and legal seniority and tenure rights of white teachers who would be displaced. In this regard, it seems to have anticipated the opinion of the majority of the Supreme Court in *Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

The principle involved in both cases seems to be that voluntary affirmative action plans contracted between the parties are easier to defend in the courts than those mandated ab initio by federal trial courts.

The judgment of the District Court is affirmed.

WELLFORD, Circuit Judge, concurring.

I concur in the result reached in this case, but I write separately in an effort to address an issue which the majority expressly refuses to answer. *See supra* note 1.

Judge Edwards has cited at length from the decision of the trial judge, and has agreed with and adopted Judge Joiner's conclusions. My problem with this determination is that Judge Joiner expressly relied upon *Oliver v. Kalamazoo Board of Education,* 498 F.Supp. 732 (W.D.Mich. 1980), in stating a proposition essential to his decision:

> [I]n the setting of this case, it is appropriate to compare the percentage of minority teachers to the percentage of minority students in the student body, rather than with the percentage of minorities in the relevant labor market. It is appropriate because teaching is more than just a job. Teachers are role-models for their students. More specifically, minority teachers are role-models for minority students. This is vitally important because societal discrimination has often deprived minority children of other role-models. *See, Oliver v. Kalamazoo Board of Education,* 498 F.Supp. 732, 748 (W.D.Mich. 1980) ("faculty ought to begin to approximate the percentage of minority students in the district").

*Wygant v. Jackson Board of Education,* 546 F.Supp. 1195, 1201 (E.D.Mich.1982).

This court, however, reversed the trial court in *Oliver.* In doing so it was made clear that comparing the percentage of minority teachers to the percentage of minority students and then requiring a minority quota of teachers based on the latter proportion was not only *not* constitutionally mandated, it was inappropriate under the circumstances because the court had ignored the practicalities of the situation in the school district. *Oliver v. Kalamazoo Board of Education,* 706 F.2d 757, 762 (6th Cir.1983). *See also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 375, 97 S.Ct. 1843, 1874, 52 L.Ed.2d 396 (1977) (court should take practicalities into account in devising remedies under Title VII and in any equitable decree.)

This court, moreover, in reversing the trial court in the *Oliver* case, stated:

> In most school desegregation cases, as in this one, *see* 498 F.Supp. at 746, 751, the constitutional rights to be vindicated are those of the students, not of the teachers or potential teachers. *The students, however, do not have a constitutional*

*right to attend a school with a teaching staff of any particular racial composition. See Fort Bend Independent School District v. City of Stafford, 651 F.2d 1133 (5th Cir.1981) (holding that the percentage of minority faculty need not approximate the percentage of minority students). Rather, with respect to the teaching staff, all that the students are entitled to is the "sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices." Id. at 1140.*

706 F.2d at 762 (footnote omitted) (emphasis added).

This court, then, in citing with approval *Fort Bend Independent School District v. City of Stafford*, 651 F.2d 1133, (5th Cir. 1981), a case decided after the district court decision in *Oliver*, held that there is no constitutional right to attend a school with a minority teacher ratio the same as the minority ratio of students. So long as the school district, over a period of years, had voluntarily hired minority teachers without evidence of discrimination, it was erroneous to impose a quota system utilizing the minority student ratio as the minimum quota for minority teachers. *Oliver*, 706 F.2d at 763. The court, rather, advised:

> But, generally, the wiser approach is a more flexible affirmative action program rather than a hiring quota. *Cf. University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (affirmative action admission programs of educational institutions may take race into account, but racial quotas are prohibited).

*Id.* at 763.

Had the plaintiffs in this case presented data as to the percentage of qualified minority teachers in the relevant labor market to show that defendant Board's hiring of black teachers over a number of years had equaled that figure, I believe this court

may well have been required to reverse under the rationale of *Oliver*. For example, had defendant shown that from 1969 to 1972 the qualified minority teacher ratio in the relevant market was 10% and that 16% of its teachers hired were a minority, the rationale of *Oliver* would have brought the contract provision at issue into very serious question. *See United Steelworkers v. Weber*, 443 U.S. 193, 209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979), (Court indicated that a showing of "conspicuous racial imbalance" was required). It is a close case, moreover, as to whether the data which was presented was sufficient under *Oliver* standards.[1]

The case relied upon by the trial judge and the panel majority, *Detroit Police Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), based its decision upon a comparison of hiring of minorities and the Detroit SMSA labor market ratio of eligible minorities in the Detroit Police Force. Thus, *Young* utilized an available, reasonable labor base of eligible minority workers, not the general population of the city served by the police force. The metropolitan labor market should be the "proper comparison." *See Young*, 608 F.2d at 688, and *Hazelwood School District v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977).

There can be no doubt, in light of the *Teamsters* case, that the District Court's comparison of Hazelwood's teacher work force to its student population fundamentally misconceived the role of statistics in employment discrimination cases. The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market. *See Teamsters, supra*, [431 U.S.] at 337–338, and n. 17 [97 S.Ct. at 1855–1856 and n. 17]. The percentage of Negroes on Ha-

---

**1.** Judge Joiner conceded that from 1968–1969 to 1971–1972 the ratio of black minority teaching staff rose from 3.9% to between 8.3% and 8.8% in the Jackson School District. In *Oliver*, the

minority ratio, of teachers in the Kalamazoo School District rose from 6.5% to 11.5% between 1970–1971 and March, 1979.

zelwood's teaching staff in 1972–1973 was 1.4% and in 1973–1974 it was 1.8%. By contrast, the percentage of qualified Negro teachers in the area was, according to the 1970 census, at least 5.7%.

*Hazelwood School District,* 433 U.S. at 308, 97 S.Ct. at 2741–42 (footnotes omitted). Underrepresentation, then, of minority teachers as found by Judge Joiner based on a student minority ratio was simply improper under *Oliver* and *Hazelwood; Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.), *vacated in part on reh'g,* 712 F.2d 222 (1983), *cert. denied,* — U.S. —, 104 S.Ct. 703, 79 L.Ed.2d 168 *reh'g denied,* — U.S. —, 104 S.Ct. 1431, 79 L.Ed.2d 754 (1984), was decided prior to our decision in *Oliver* and cannot override *Hazelwood* on this issue.

I would AFFIRM the decision that this voluntary affirmative action layoff system, subjected to collective bargaining safeguards, was sufficient to meet the challenge presented by plaintiffs.

I concur with the majority that there was no basis for the exercise of pendent jurisdiction under *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).