Robert T. DEVERAUX, et al.,
Plaintiffs, Appellants,

v.

William J. GEARY, et al.,
Defendants, Appellees,

and

Plaintiff-Class in Culbreath v. Dukakis,
Intervenors-Appellees.

No. 84–2004.

United States Court of Appeals,
First Circuit.

Argued April 5, 1985.
Decided June 24, 1985.

---

Gabriel O. Dumont, Jr., Boston, Mass., with whom Grady, Dumont & Dwyer, Boston, Mass., was on brief for plaintiffs, appellants.

Charles J. Cooper, Deputy Asst. Atty. Gen., Michael A. Carvin and Mary E. Mann, Attys., Dept. of Justice, and Wm. Bradford Reynolds, Asst. Atty. Gen., Washington, D.C., were on brief for the U.S., amicus curiae.

Despena Fillios Billings, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief for defendants-appellees.

James H. Wexler, Boston, Mass., with whom Herrick & Smith, Herman J. Smith, Jr., Boston University Legal Aid Program, Ilene Seidman and Ruth Diaz-Aguilar, Greater Boston Legal Services, Boston, Mass., were on brief for intervenors-appellees.

Jonathan M. Albano, Boston, Mass., with whom John F. Adkins, Bingham, Dana & Gould, Marjorie Heins, Massachusetts Civil Liberties Union Foundation, Barbara Arnwine, Lawyers' Committee for Civil Rights Under Law of the Boston Bar Ass'n, Boston, Mass., William L. Robinson and Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., were on brief for the Lawyers' Committee for Civil Rights Under Law of the Boston Bar Ass'n, Civil Liberties Union of Massachusetts, and Lawyers' Committee for Civil Rights Under Law, amici curiae.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiffs, five non-minority members of the Metropolitan District Commission ("MDC") police force, appeal from a judgment of the United States District Court for the District of Massachusetts, 596 F.Supp. 1481, dismissing their complaint for failure to state a claim upon which relief could be granted after finding their attempt to intervene in the case of *Culbreath v. Dukakis* untimely.

The issue, whose resolution will decide the procedural as well as the substantive question before us, is whether the Supreme Court's decision in *Firefighters Local No. 1784 v. Stotts*, —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), requires us to read Title VII of the Civil Rights Act as prohibiting voluntary affirmative action efforts like those reflected in the *Culbreath* consent decree which benefit individuals who are not proven victims of actual discrimination. Arguing that *Stotts* compels such a reading, plaintiffs insist that they should be permitted to intervene in *Culbreath* in order to secure a modification of the consent decree.

We agree with the district court that *Stotts* (which dealt with a different situation) does not make it clear that the challenged consent decree is no longer lawful. The weight of circuit authority construes *Stotts* as not invalidating such a decree. Particularly as the challenged decree has only about two more years to run, and as the Supreme Court will soon hear a case that could clarify the issue, we decline to tamper with the *Culbreath* decree at this time. We affirm the judgment of the district court.

## I.

This controversy has its roots in an action brought in 1974 by minority state employees against state officials. The minority employees, later certified as a class, sought to correct alleged historical and ongoing discriminatory hiring and promotion-

al practices in the state civil service. *See Culbreath v. Dukakis*, 630 F.2d 15 (1st Cir.1980) (action originally brought *sub nom. Jackson v. Sargent*, No. 74–24633–MA). After two years of negotiations, the parties submitted a proposed stipulation of facts and consent decree to the district court. The stipulation stated that there was a disproportionate underemployment of minorities in certain state agencies and that such underemployment had been caused by employment practices engaged in, or perpetuated by, defendants. The stipulation represented,

> [t]he parties believe that the stipulation of facts set forth below and acknowledged by the Court constituted findings of past practices of discrimination of both a judicial and administrative nature, sufficient to sustain an action under Title VII of the Civil Rights Act of 1964, thereby providing sufficient grounds for the remedies set forth in the Decree.[1]

The *Culbreath* consent decree then set forth the terms of a negotiated settlement, including goals for the appointment and promotion of minorities in civil service job grades in the MDC for a period of eight years, beginning in January 1979 and ending in December 1987.

Between November 1978 and February 1979, more than four years after the action's commencement and contemporaneously with the submission of the proposed stipulation and decree, the Massachusetts Organization of State Engineers and Scientists, Locals 285 and 509, the Service Employees International Union, AFL–CIO, the Massachusetts Law Enforcement Council, and the National Association of Government Employees filed motions to intervene in *Culbreath*. After notice to the class, *see* Fed.R.Civ.P. 23(e), the district court held a hearing on the entry of the consent decree and the motions to intervene. In August 1979, the court denied the motions to intervene as untimely and entered the stipulation of facts and the consent decree.

This court upheld the district court's decision to deny the motions to intervene in *Culbreath v. Dukakis*, 630 F.2d 15 (1st Cir.1980). We evaluated four factors that aid in determining whether intervention requests are "timely" under Fed.R.Civ.P. 24: (1) the length of time the potential intervenors knew or reasonably should have known of their interest before they petitioned to intervene; (2) the prejudice to existing parties due to the potential intervenor's failure to petition for intervention promptly; (3) the prejudice the potential intervenors would suffer if they were not allowed to intervene; and (4) the existence of unusual circumstances militating either for or against intervention. *See id.* at 20–24. *See also Stallworth v. Monsanto Co.*, 558 F.2d 257, 264 (5th Cir.1977). After finding that the would-be intervenors reasonably should have known of their interest four years before they petitioned to intervene, that they would not be prejudiced by denial of intervention, and that the parties' interests could be severely hampered if intervention were permitted, we concluded that the district court correctly found the intervention petitions untimely.

In July 1984, the instant action was brought by five white, male police lieutenants against William J. Geary, the Commissioner of the MDC, and Thomas E. Keogh, Superintendent of the MDC police force. Plaintiffs challenge the promotion of a black officer, Donald E. Callender, to a provisional position as an MDC police captain pursuant to the promotion guidelines of the consent decree. Specifically, they contend that although they all scored higher than Callender on the competitive exami-

---

**1.** The plaintiff class in *Culbreath* originally grounded its claims on 42 U.S.C. §§ 1981, 1983, not on Title VII. About two years into the litigation, however, the Supreme Court ruled in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1979), that in section 1981 and section 1983 actions, plaintiffs must prove intentional discrimination to recover. Since the *Cul-* breath complaint did not contain allegations of intentional discrimination, the parties in *Culbreath* treated the action as one brought pursuant to Title VII. For purposes of this appeal, it is clear that the *Culbreath* consent decree was entered under Title VII and must be reviewed accordingly. *See* note 2, *infra*.

nation administered to determine promotion eligibility, they were denied the opportunity to be considered for the position of temporary MDC police captain because of their race. They also state that ultimately one plaintiff who would have received the position had the consent decree not required that this position be filled by a minority was denied the position because of his race. They claim that by making race "the determinative selection factor," defendants deprived plaintiffs of their fourteenth amendment equal protection rights and violated 42 U.S.C. § 1981.

On August 8, 1984, defendants filed a motion to dismiss. On August 16, 1984, the *Culbreath* class filed a motion to intervene as a defendant, which was unopposed, and a motion to dismiss. After all parties submitted briefs on the motions to dismiss, the district court granted the class's motion to intervene and allowed defendants' motions to dismiss.

The district court chose to treat plaintiffs' complaint as a motion to intervene in *Culbreath*, rather than as an impermissible collateral attack on the *Culbreath* consent decree. In addressing the timeliness of plaintiffs' attempt to intervene, the court found that but for the Supreme Court's decision in *Firefighters Local Union No. 1784 v. Stotts*, the situation before the court was the same as that before it when it denied the prior petitions to intervene in 1980. It ruled that absent *Stotts*, the *Stallworth* factors unambiguously required a denial of intervention and a dismissal of the case.

The issue, then, was whether the *Stotts* decision so changed the law of Title VII that it constituted an "unusual circumstance" militating for intervention[2] and, ultimately, for revision of the consent decree. The district court rejected plaintiffs' argu-

ment that the *Stotts* Court meant to rewrite Title VII law to make all affirmative action plans improper absent a finding of actual past discrimination. It noted,

> [h]ad the Court intended to radically change its interpretation of Title VII law so as to require a finding of actual discrimination in any affirmative action case, I believe it would have said so. In the absence of clearer authority, I decline to read such an expansive meaning into an opinion limited to a discussion of layoffs made in violation of a bona fide seniority system. The plaintiffs here seek too broad a rule from too narrow a set of facts.

We concur in this analysis and accordingly affirm.

### II.

In *Stotts*, a plaintiff class of black firefighters sued the Memphis, Tennessee, Fire Department and state officials alleging a pattern or practice of discrimination in hiring and promotion decisions in violation, among other provisions, of Title VII. A consent decree was entered into which had the stated purpose of remedying the Department's hiring and promotion practices with respect to blacks. The City, however, specifically indicated in the decree that it did not admit to " 'any violations of law, rule or regulation with respect to the allegations' " in the complaint. *Stotts*, —— U.S. at ——, 104 S.Ct. at 2581. Providing that minority membership in the Fire Department would be increased to approximate the proportion of minorities in the county labor force, the decree set as an interim hiring goal the filling of 50 percent of job vacancies annually with qualified black applicants. The decree did not, how-

---

**2.** Plaintiffs argue that the fourth *Stallworth* factor, the existence of unusual circumstances militating for intervention, applies here. *See* page 270, *supra*. They contend that the Court's decision in *Stotts* changed the law of Title VII so as to render parts of the *Culbreath* consent decree invalid, and that the Court has expressly ordered that "when a change in the

law [brings] the terms of a consent decree into conflict with the statute pursuant to which the decree was entered, the decree should be modified over the objections of one of the parties bound by the decree." *Stotts*, —— U.S. at —— n. 9, 104 S.Ct. at 2587 n. 9 (citing *System Federation No. 91 v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961)).

ever, provide against the possibility of future layoffs. *Id.*

Nearly a year after the district court approved and entered the decree, the City announced that due to budget deficits, it would have to lay off a number of city personnel. The City declared that it would base the layoffs on the "last hired, first fired" rule provided for in a seniority system adopted pursuant to an earlier city-wide consent decree with the United States. *Id.* The district court, however, at the request of the class and over the objection of the City, entered an injunction forbidding the seniority-based layoffs. The court found that the layoffs would have a racially discriminatory effect, which rendered the otherwise valid seniority system not a "bona fide" one protected under Title VII. In response to this order, the City proposed and the court approved a modified plan requiring that layoffs be made in accordance with a racial quota designed to preserve the advances made through the consent decree in increasing the proportion of black employees on the force. The layoffs were then carried out, and as a result of the court's order, certain non-minority employees with more seniority than minority employees were laid off or demoted in rank.

The Sixth Circuit affirmed the district court's order, although it held that the seniority system was a "bona fide" one. It concluded that the seniority-based layoffs would violate the terms of the consent decree by decreasing the percentage of minorities in the Department and that the district court therefore had the power to enforce the decree by ordering the modification of the seniority-based layoff system. Alternatively, the Sixth Circuit held that the district court's order was valid even if seen as a modification of the decree because new and unforeseen circumstances had created a hardship for one of the parties to the decree. *Stotts,* — U.S. at —, 104 S.Ct. at 2583. The court rejected the argument that any modification was improper because it conflicted with a bona fide seniority system immunized from Title

VII attack by section 703(h) of that Act. *Id.*

The Supreme Court reversed, ruling that the district court's injunction could not be justified either as an effort to enforce the consent decree or as a modification of the decree that could be forced on the City without its consent. The Court saw "the issue at the heart of the case" as "whether the district court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority." *Id.* at —, 104 S.Ct. at 2584.

In resolving this question, the Court first pointed out that the "injunction does not merely enforce the agreement of the parties as reflected in the consent decree." *Id.* at —, 104 S.Ct. at 2586.

The Court then turned to the question of whether the district court's order could be sustained as a valid modification of the decree. *Id.* at — – —, 104 S.Ct. at 2586–91. The Court relied on *System Federation No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (a court, upon motion of a party, must modify a consent decree when a change in the law brings it into conflict with the objectives of the statute that authorized it), in ruling that a district court cannot modify a Title VII consent decree over the objection of one of the parties if the resulting order conflicts with the statute underlying the consent decree. *Stotts,* — U.S. at — n. 9, 104 S.Ct. at 2587 n. 9. The Court then found that the proposed modification conflicted with Title VII and that the district court's authority to impose a new seniority system upon an unwilling employer in contravention of an existing bona fide seniority system is therefore limited to situations where this relief is appropriate under Title VII, *i.e.,* when the individual plaintiffs can prove that they have been the actual victims of discriminatory practices.

In reaching this result, the Court relied upon its earlier decision involving section

703(h) [3] in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). In *Franks*, the Court had held that section 703(h) merely states that the operation of a bona fide seniority system will not constitute an illegal discriminatory employment practice, and does not bar retroactive awards of seniority as relief appropriate under section 706(g). The Court also relied upon its ruling in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that an individual had to prove that a discriminatory practice had an impact on him before a court could award him retroactive seniority. The Court went on to state that "[o]ur ruling in *Teamsters* that a court can award competitive seniority only when the beneficiary of the award has actually been a victim of illegal discrimination is consistent with the policy behind § 706(g) of Title VII,[4] which affects the remedies available in Title VII litigation." *Stotts*, —— U.S. at ——, 104 S.Ct. at 2589 (footnotes omitted). The Court referred to statements made in the Title VII congressional debates in which the policy behind section 706(g) was "repeatedly expressed": "to provide make-whole relief only to those who have been actual victims of illegal discrimination." *Id.*

The contention that *Stotts* controls this case must be based on inferences drawn from open-ended language in the *Stotts* opinion, as the facts and issues in *Stotts* are plainly distinguishable. Unlike the situation in *Stotts*, we are not concerned here with a district court's power over objection of one of the parties to the decree, to order retroactive relief that the consent decree never provided. Rather, the present plaintiffs challenge provisions in the consent decree to which the original parties had voluntarily agreed. Additionally, the affirmative action ordered by the district court in *Stotts* was in direct conflict with a bona fide seniority system protected by section 703(h) of Title VII. Our case does not involve section 703(h) as there is no claimed conflict between a seniority plan and the remedies provided for in the decree.

A further distinction is that the parties to the *Stotts* decree had expressly disclaimed that the violations alleged in the complaint existed, whereas in this case the parties stipulated that discriminatory patterns and practices existed that were sufficient to support a Title VII action.

The above distinctions have been regarded as crucial by other circuits. *See EEOC*

---

**3.** Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), provides:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin....

**4.** Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

ate, which may include, but is not limited to, reinstatement or hiring of employees with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

*v. Local 638,* 753 F.2d 1172, 1186 (2d Cir. 1985) (distinguishing *Stotts* because here there was no direct conflict with a bona fide seniority plan; the *Stotts* Court's decision involved the retroactive award of competitive seniority, not the prospective relief awarded here; and unlike *Stotts,* here there was a finding that plaintiffs intentionally discriminated against non-whites). *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 486 (6th Cir.1985) (distinguishing *Stotts* on the facts and rejecting plaintiffs' argument that *Stotts* controls where voluntary plan did not directly deal with seniority). *Diaz v. American Telephone & Telegraph,* 752 F.2d 1356, 1360 n. 5 (9th Cir.1985) (limiting *Stotts* to its facts). *Van Aken v. Young,* 750 F.2d 43, 45 (6th Cir.1984) (distinguishing *Stotts* because the instant case involved an affirmative action plan voluntarily applied by city at point of hiring and unrelated to seniority rights). *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1157–58 (6th Cir.1984) (*Stotts* does not affect affirmative action plan that "resulted from voluntary decisions in the collective bargaining process"), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985). *Kromnick v. School District of Philadelphia,* 739 F.2d 894, 911 (3d Cir.1984) (distinguishing *Stotts* because here there is "no overriding of a bona fide seniority plan, and no requirement of race-conscious layoffs"), *cert. denied,* —— U.S. ——, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). *Grann v. City of Madison,* 738 F.2d 786, 795 n. 5 (7th Cir.) (distinguishing *Stotts* by stating that here, discrimination is acknowledged, the city defendant agreed to the relief provided, and this case involves promotions and pay, not seniority rights), *cert. denied,* —— U.S. ——, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984). *See also Hammon v. Barry,* 606 F.Supp. 1082, 1095 (D.D.C.1985) (rejecting suggestion that *Stotts* precludes use of any race-conscious affirmative action plan and dis-

tinguishing *Stotts* on ground that this is a voluntary plan that does not directly affect vested seniority rights). *Turner v. Orr,* 759 F.2d 817, 823–826 (11th Cir.1985) (distinguishing *Stotts* because this case did not involve infringement of a bona fide seniority system; no third party rights are involved here as no non-minority worker had to step down to accommodate a minority; and this case involves a consent judgment entered into by the parties). *NAACP v. Detroit Police Officers Association,* 591 F.Supp. 1194, 1202–03 (E.D.Mich. 1984) (distinguishing *Stotts* on ground that it dealt with court-imposed affirmative action plan that did not by its terms deal with layoff question whereas the plan at bar was voluntary and explicitly adjusted seniority rights).

Plaintiffs argue that although *Stotts* may be factually distinguishable, the clear implication of the Court's language in *Stotts* outlaws the use of any race-conscious affirmative action plan.

We are not so sure. It is not easy to determine from the plurality opinion in *Stotts* just how far a majority of the Court would want to go in the present situation. Moreover, the Court had earlier held in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), that Title VII does not forbid private employers from voluntarily entering into affirmative action plans to eliminate manifest racial imbalances in employment categories. The expansive reading of *Stotts* urged by plaintiffs would require us to find that *Stotts* overruled *Weber sub silentio.* In view of the importance of any such action, it seems likely that the Court would have directly addressed *Weber* if it had intended to overrule that decision. All the circuits considering the issue have concluded, in the absence of any express pronouncement to the contrary, that *Weber* remains good law.[5] *See EEOC v. Local*

---

**5.** Although plaintiffs do not specifically raise the point, the fact that one of the parties to the consent decree challenged in this case is the City, a public employer, does not alter our analysis. The *Stotts* Court expressly declined to

consider whether Title VII would prohibit the City of Memphis from voluntarily achieving the same results as the district court's order by adopting an affirmative action plan. *Stotts,* —— U.S. at ——, 104 S.Ct. at 2590. In the absence of

*638,* 753 F.2d at 1185–86; *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d at 487–88; *Diaz v. American Telephone & Telegraph,* 752 F.2d at 1360 n. 5; *Van Aken v. Young,* 750 F.2d at 45; *Wygant v. Jackson Board of Education,* 746 F.2d at 1158; *Kromnick v. School District of Philadelphia,* 739 F.2d at 911; *Grann v. City of Madison,* 738 F.2d at 795 n. 5.

We recognize, of course, that this is a difficult and sensitive area in which we and the other circuit courts could be mistaken in our reading of current precedent. But this hardly seems the case or the moment for us to strike out in a new direction. The consent decree that plaintiffs wish to challenge has almost run its course, expiring by its own terms in 1987. Up to now people have relied on the decree as reflecting both the agreement of the parties and the command of a federal court. Unless we can say with greater certainty than is now possible that the decree, contrary to former assumptions, is invalid, it would seem better to leave it undisturbed, at least until the Supreme Court has shed more light in this area, which it quite possibly may do within the next term. *See Wygant v. Jackson Board of Education,* 746 F.2d 1152 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985).[6]

*Affirmed.*

a definitive ruling from the Court, we adhere to the precedent upholding the validity of voluntary affirmative action programs instituted by public employers. *See Bushey v. New York State Civil Service Commission,* 733 F.2d 220, 227 n. 8 (2d Cir.1984) ("We reject Plaintiffs' contention that *Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 ..., is inapplicable because the employer in *Weber* was a private entity whereas here it is a public entity."). *See also Kirkland v. New York State Department of Correctional Services,* 711 F.2d 1117 (2d Cir.1983) (applying *Weber* ), *cert. denied,* —— U.S. ——, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *Bratton v. City of Detroit,* 704 F.2d 878, 884 n. 18 (6th Cir.1983) (applying *Weber* ), *cert. denied,* —— U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *Local Union No. 35 v. City of Hartford,* 625 F.2d 416, 435 (2d Cir.1980) (applying *Weber* ), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). *Cf. Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F.2d 9, 17

(1st Cir.1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

**6.** In *Wygant,* the Sixth Circuit held that a collective bargaining agreement that, as part of the school board's voluntary affirmative action plan, limited layoffs of minority group teachers in the event of reductions in staff, did not, despite the absence of direct findings of discrimination against minority teachers, violate the equal protection clause or Title VII. *See Wygant,* 746 F.2d 1152, certiorari granted —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298. *See also* 53 U.S.L.W. 3692 (subject matter summary of case recently docketed). The Court granted certiorari to examine the question of whether the Constitution tolerates racial preferences for teacher layoffs adopted by a public employer, in the absence of findings of past discrimination, that are based solely upon the disparity between respective percentages of minority faculty members and students. *Id.*