**Barbara CULBREATH, et al., Plaintiffs,**

v.

**Michael S. DUKAKIS, et al., Defendants.**

**Civ. A. No. 74–2463–MA.**

United States District Court, D. Massachusetts.

Sept. 30, 1988.

Ilene Seidman, Ruth Diaz–Aguilar, Greater Bost. Legal Serv., James H. Wexler, Kotin, Crabtree & Strong, Boston, Mass., for plaintiffs.

Despena Billings, Asst. Atty. Gen., Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The defendants have moved that the consent decree entered by this Court on August 30, 1979 be vacated as to all defendants and that the action be dismissed pursuant to paragraph 56 of the decree. The plaintiffs do not object because the appointing authority defendants have met or exceeded the minority percentage goals in all grade groupings specified for years 5–8 in Attachment A to the decree.[1] After hearing, the Court finds that the defendants are now employing a percentage of minorities in all grade groupings equal to, or greater than, the percentage goals specified for years 5–8 in Attachment A. Therefore, dismissal of the case under paragraph 56 is appropriate.

A brief history of the case follows. Commenced on July 1, 1974, as a class action suit, the complaint sought declaratory and injunctive relief in redress of al-

---

1. The few instances where goals in the lowest job grades were not met due to impossibility are not challenged by the plaintiffs and are excused by this Court.

leged discriminatory hiring and promotional practices by various state agencies. Pursuant to the defendants' motion to dismiss on five grounds, the Court ruled that plaintiff, Jackson, lacked standing but denied all other grounds. *Jackson v. Sargent,* 394 F.Supp. 162, 173 (D.Mass.1975). The decision was affirmed by the First Circuit. *Jackson v. Dukakis,* 526 F.2d 64 (1st Cir.1975). The case thereafter became known as *Culbreath v. Dukakis.*

On September 22, 1976, the class was certified as to all racial minority residents of Boston who applied for jobs or promotions in Boston with the Metropolitan District Commission (MDC), Registry of Motor Vehicles (RMV), Department of Public Works (DPWks), or Department of Public Welfare (DPW) at civil service grade 20 or below.[2]

In December, 1976, the parties initiated settlement negotiations, which lasted two years and culminated in a comprehensive forty-nine page consent decree and stipulation of facts drafted by the plaintiffs' attorneys at Greater Boston Legal Services and several attorney generals on behalf of the defendants. The decree was entered under Title VII, 42 U.S.C. §§ 2000e, et seq.[3] Adopting the allegations in the complaint, the stipulation stated that there was a disproportionate underemployment of minorities in the named state agencies and that such underemployment had been caused by widespread discriminatory employment practices engaged in, or perpetuated by, the defendants. Numerous discriminatory practices were described. The four state agencies noted above were identified in the decree as appointing authority defendants. The Governor, Secretary of Administration and Finance, Personnel Administrator, and Civil Service Commissioner were identified as "non-appointing authority defendants." The decree required the defendants to pursue a vigorous affirmative action program designed to remedy the significant underemployment of minorities and remove the vestiges of discriminatory hiring and promotional practices. A primary remedy was to ensure the defendants' achievement of percentage goals for minority hiring and promotion of qualified minorities in the defendants' agencies specified in Attachment A to the decree.

After denying untimely motions to intervene filed by several government employees' unions, the Court entered the consent decree and stipulation of facts on August 30, 1979. The Court's decision to deny the motions to intervene was upheld on appeal. *Culbreath v. Dukakis,* 630 F.2d 15 (1st Cir.1980).

The consent decree has withstood numerous challenges to its operation over time. In 1980, the MDC refused to promote a qualified black police officer to police sergeant, contending that the decree did not apply to promotional police positions. On July 28, 1980, the Court granted the plaintiffs' motion and issued an order enforcing the consent decree. In 1981, the Department of Personnel, RMV and DPWks sought to lay off several class members, including key *Culbreath* recruitment personnel, citing budget constraints pursuant to enactment of "Proposition 2½," G.L. c. 580. On the plaintiffs' motion for injunctive relief, the Court issued an order on November 11, 1981 that the decree superceded state law, thus prohibiting the termination of *Culbreath* personnel and directing the defendants to rehire sufficient minority employees to ensure compliance with Year 2 goals. On August 18, 1982, the Court granted the plaintiffs' motion to apply and enforce the consent decree against the Department of Social Services (DSS) which was created to assume all of the social service functions previously administered by the DPW. On January 27, 1984,

2. Through negotiations, the parties later broadened the scope of the class to encompass racial minority residents within the Boston standard metropolitan statistical area.

3. Although the *Culbreath* plaintiffs originally grounded their claims on 42 U.S.C. § 1983, the Supreme Court subsequently ruled in *Washing-* *ton v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1979), that in section 1981 and 1983 actions plaintiffs must prove intentional discrimination to recover. Since the *Culbreath* complaint did not allege intentional discrimination, the parties and the court treated the action as one brought pursuant to Title VII.

the Court ordered the defendants to cancel an MDC police lieutenant examination and administer a properly validated examination within six months, pursuant to the plaintiffs' motion for declaratory and injunctive relief on behalf of a class member.

On July 16, 1984, five white MDC police officers filed a reverse discrimination action against the MDC challenging the promotion of a black MDC officer on equal protection grounds. The action sought to invalidate the consent decree in light of the Supreme Court's decision in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). The *Culbreath* defendants moved to dismiss the action and the *Culbreath* plaintiffs moved to intervene as defendants. The Court dismissed the case on November 4, 1984, ruling, among other things, that the action was, in essence, an untimely attempt to intervene in the operation of the consent decree, and that the *Stotts* case did not so change Title VII law as to invalidate the decree. *Deveraux v. Geary*, 596 F.Supp. 1481 (1984). The Court of Appeals affirmed the Court order on June 24, 1985 in *Deveraux v. Geary*, 765 F.2d 268 (1985) and the Supreme Court denied the *Deveraux* plaintiffs' petition for certiorari on July 7, 1986, thereby affirming the lower courts' orders. On November 30, 1983, the Court denied the plaintiffs' request that the monitor attain full-time status, concurring with the defendants' position that the monitor's duties could be accomplished on a part-time basis.

In the first few years of the consent decree, the plaintiffs often expressed dissatisfaction with slow-paced implementation and concern that certain defendants were resistant to the letter and spirit of the decree. Bi-annual reports to the Court document the uneven and hesitant course of the progress towards goal compliance. An overall change in the Executive Department, delay in the appointment of the first permanent monitor, three personnel changes in that position, among other things, contributed to the defendants' slow progress.

In recent years, however, the defendants demonstrated substantial improvement in the percentage of minority employees. The efforts of the current monitor, Helen Chin Schlichte, in overseeing compliance with the obligations of the decree in conjunction with the Attorney General's office are to be commended. Her appointment by the Secretary of Administration and Finance in December, 1984, marked a turning point in the implementation process. For the first time, supervision of the decree was directed from the executive office as required by paragraph 51 of the decree. The two previous monitors had also served as General Counsel to the State Office of Affirmative Action.

The plaintiffs' determined pursuit of full compliance through their attorneys at Greater Boston Legal Services has been a significant component in the successful conclusion of this case. I must emphasize the importance of programs such as Greater Boston Legal Services. The amount of time consumed in a case of this magnitude may not have been available from the private bar. The commitment of Greater Boston Legal Services attorneys over the years starting in 1974 and to the present has been extraordinary.

I must also recognize the defendants' hard work and often daily commitment of personnel in their *Culbreath* teams, as well as financial resources necessary to comply with the decree's complex requirements. It has been no small task for all agencies involved, and their efforts are to be commended.

It is also worth noting that, while displaying zealous and quality representation of their separate clients' interest at all times from the onset of this litigation, the Greater Boston Legal Services attorneys representing the plaintiffs and the Assistant Attorney General representing the defendants have consistently demonstrated a high level of professionalism and, where appropriate, cooperation in resolving disputes.

Designed to rectify widespread discriminatory hiring practices that had long precluded minorities from having equal access to state positions, the consent decree was the creation of both parties, and it was an effective tool in addressing affirmative action deficiencies. It is unlikely that a trial

of this case would have produced the practical mechanisms to remediate past wrongs which the parties were able to include in the consent decree. From broadbanding of examinations and streamlining job classifications and career ladders, to creating an effective recruitment and training program, implementation of the decree has opened the defendants' doors offering employment opportunities to numerous minorities. As the present monitor has noted, there is a very different landscape in the defendants' agencies today as a result of affirmative action policies which have now been institutionalized, a modernized civil service system and employee training program.

Dismissal of this action does not mean the end of the defendants' affirmative action obligations. The gains of recent years will soon be diminished or undone unless the defendants continue to pursue employment practices designed to attract and retain qualified minority employees. The defendants have expressed and demonstrated their strong and continuing commitment to affirmative action, as evidenced by Executive Order No. 227, signed on February 25, 1983 and the voluntary statewide affirmative action goals established by the State Office of Affirmative Action.

Finally, I wish to record and acknowledge more directly the assistance of counsel in bringing this matter to a conclusion and providing me with draft memoranda summarizing briefly the course of this litigation over the past years, Attorneys Ruth Diaz–Aguilar, R. Peter Anderson and James H. Wexler for plaintiffs and Assistant Attorney General Despena F. Billings for the defendants. Over the course of many years and many hearings and conferences, they have made an immense contribution to the results achieved today.

Accordingly, the defendants' motion to vacate the consent decree is GRANTED and an order of dismissal will be entered.

SO ORDERED.